
USCA Case #15-1277    Document #1567765    Filed: 08/13/2015    Page 1 of 129

RECEIVED

AUG 13 2015

No. __15-1277__

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    AUG 13 2015

CLERK

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE WEST VIRGINIA, et al.

*Petitioner.*

---

### On Petition for Extraordinary Writ to the
### United States Environmental Protection Agency

---

## EMERGENCY PETITION FOR EXTRAORDINARY WRIT

Patrick Morrisey
  Attorney General of
  West Virginia

State Capitol
Building 1, Room 26-E
Tel. (304) 558-2021
Fax (304) 558-0140
Email: elbert.lin@wvago.gov

Elbert Lin
  Solicitor General
  *Counsel of Record*

Misha Tseytlin
  General Counsel

J. Zak Ritchie
  Assistant Attorney General

*Counsel for Petitioner State of West Virginia*

## COUNSEL FOR ADDITIONAL PETITIONERS

LUTHER STRANGE
  Attorney General of Alabama
Andrew Brasher
  Solicitor General
  Counsel of Record
501 Washington Ave.
Montgomery, AL 36130
**Counsel for Petitioner**
  **State of Alabama**

PAMELA JO BONDI
  Attorney General of Florida
Allen Winsor
  Solicitor General
  Counsel of Record
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
**Counsel for Petitioner**
  **State of Florida**

DEREK SCHMIDT
  Attorney General of Kansas
Jeffrey A. Chanay
  Chief Deputy Attorney General
  *Counsel of Record*
120 SW 10th Avenue, 3d Floor
Topeka, KS 66612
**Counsel for Petitioner**
  **State of Kansas**

LESLIE RUTLEDGE
  Attorney General of Arkansas
Jamie L. Ewing
  Assistant Attorney General
  *Counsel of Record*
323 Center St., Ste. 400
Little Rock, AR 72201
**Counsel for Petitioner**
  **State of Arkansas**

GREGORY F. ZOELLER
  Attorney General of Indiana
Timothy Junk
  Deputy Attorney General
  *Counsel of Record*
Indiana Government Ctr. South, Fifth
Floor
302 West Washington Street
Indianapolis, IN 46205
**Counsel for Petitioner**
  **State of Indiana**

JACK CONWAY
  Attorney General of Kentucky
  *Counsel of Record*
700 Capital Avenue
Suite 118
Frankfort, KY 40601
**Counsel for Petitioner**
  **Commonwealth of Kentucky**

JAMES D. "BUDDY" CALDWELL
  Attorney General of Louisiana
Megan K. Terrell
  Deputy Director, Civil Division
  *Counsel of Record*
1885 N. Third Street
Baton Rouge, LA 70804
***Counsel for Petitioner***
  ***State of Louisiana***

DOUG PETERSON
  Attorney General of Nebraska
Dave Bydlaek
  Chief Deputy Attorney General
Justin D. Lavene
  Assistant Attorney General
  *Counsel of Record*
2115 State Capitol
Lincoln, NE 68509
***Counsel for Petitioner***
  ***State of Nebraska***

E. SCOTT PRUITT
  Attorney General of Oklahoma
Patrick R. Wyrick
  Solicitor General
  *Counsel of Record*
P. Clayton Eubanks
  Deputy Solicitor General
313 N.E. 21st Street
Oklahoma City, OK 73105
***Counsel for Petitioner***
  ***State of Oklahoma***

BILL SCHUETTE
  Attorney General of Michigan
Aaron D. Lindstrom
  Michigan Solicitor General
  Counsel of Record
P.O. Box 30212
Lansing, MI 48909
***Counsel for Petitioner***
  ***State of Michigan***

MICHAEL DEWINE
  Attorney General of Ohio
Eric E. Murphy
  State Solicitor
  *Counsel of Record*
30 E. Broad St., 17th Floor
Columbus, OH 43215
***Counsel for Petitioner***
  ***State of Ohio***

MARTY J. JACKLEY
  Attorney General of South Dakota
Steven R. Blair
  Assistant Attorney General
  *Counsel of Record*
1302 E. Highway 14, Suite 1
Pierre, SD 57501
***Counsel for Petitioner***
  ***State of South Dakota***

ii

BRAD SCHIMEL
  Attorney General of Wisconsin
Andrew Cook
  Deputy Attorney General
Daniel P. Lennington
  Assistant Attorney General
   *Counsel of Record*
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53707
***Counsel for Petitioner***
  ***State of Wisconsin***

PETER K. MICHAEL
  Attorney General of Wyoming
James Kaste
  Deputy Attorney General
   *Counsel of Record*
Michael J. McGrady
  Senior Assistant Attorney General
123 State Capitol
Cheyenne, WY 82002
***Counsel for Petitioner***
  ***State of Wyoming***

# CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Petitioners state as follows:

**(A)** **Parties, Intervenors, and Amici:**

Petitioners are the States of West Virginia, Alabama, Arkansas, Florida, Indiana, Kansas, Louisiana, Michigan, Nebraska, Ohio, Oklahoma, South Dakota, Wisconsin, Wyoming, and the Commonwealth of Kentucky. The prospective respondent is the United States Environmental Protection Agency.

**(B)** **Rulings Under Review:**

Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units; Final Rule, EPA-HQ-OAR-2013-0602; RIN 2060-AR33.

**(C)** **Related Cases:**

*In re Murray Energy Corporation*, No. 14-1112 (consolidated with *Murray Energy Corporation v. Environmental Protection Agency and Regina A. McCarthy*, No. 14-1151); *West Virginia v. EPA*, No. 14-1146.

iv

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF RELIEF SOUGHT....................................................4

STATEMENT OF THE ISSUE PRESENTED ........................................4

STATEMENT OF THE CASE AND FACTS .........................................4

I.      Statutory Overview................................................................4

II.     The Final Section 111(d) Rule................................................6

STANDING ..........................................................................................8

REASONS FOR GRANTING THE WRIT.............................................9

I.      This Court Has Authority To Stay The Rule Under The All Writs Act..........9

II.     An Order Under The All Writs Act Staying The Rule Should Issue ............11

        A.      The States Have No Adequate Alternative To Prevent
                Irreparable Harm ........................................................11

        B.      The States Are Clearly And Indisputably Entitled To Relief.............16

                1.      The Section 111(d) Rule Violates The Section 112
                        Exclusion...............................................................16

                2.      EPA Cannot Require States To Reorganize Their Energy
                        Economies Under Its Novel "Building Block" Approach........22

        C.      The Court Should Exercise Its Discretion To Issue The Writ ...........29

CONCLUSION ....................................................................................30

v

# TABLE OF AUTHORITIES

<u>Cases</u>

*Am. Elec. Power Co., Inc. v. Connecticut,*
    131 S. Ct. 2527 (2011).................................................................17

*Am. Petroleum Inst. v. SEC,*
    714 F.3d 1329 (D.C. Cir. 2013)..................................................21

*\*Am. Public Gas Ass'n v. Federal Power Comm'n,*
    543 F.2d 356 (D.C. Cir. 1976)............................... 2, 9, 10, 11, 12

*Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n,*
    461 U.S. 375 (1983)....................................................................27

*Bond v. United States,*
    134 S. Ct. 2077 (2014)................................................................28

*Cheney v. U.S. District Court,*
    542 U.S. 367 (2004)....................................................................11

*Cmty. Broad. of Boston, Inc. v. FCC,*
    546 F.2d 1022 (D.C. Cir. 1976)..................................................11

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)............................................................. 24, 25

*\*FTC v. Dean Foods Co.,*
    384 U.S. 597 (1966)................................................................9, 10

*Horsehead Res. Dev. Co. v. EPA,*
    130 F.3d 1090 (D.C. Cir. 1997)..................................................10

*\*In re al-Nashiri,*
    No. 14-1203, -- F.3d --, 2015 WL 3851966 (D.C. Cir. June 23,
    2015) .........................................................................................9, 11

*In re Murray Energy,*
    788 F.3d 330 (D.C. Cir. 2015) .............................................. 10, 30

*In re Tennant,*
    359 F.3d 523 (D.C. Cir. 2004).......................................................9

*Iowa Utils. Bd. v. FCC,*
    109 F.3d 418 (8th Cir. 1996) .......................................................12

vi

*Jacksonville Port Auth. v. Adams*,
    556 F.2d 52 (D.C. Cir. 1977)..........................................................................30

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ..................................................................11

*King v. Burwell*,
    135 S. Ct. 2480 (2015)...............................................................................24

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ................................................................... 3, 19, 29

*Nalco Co. v. EPA*,
    786 F. Supp. 2d 177 (D.D.C. 2011)............................................................12

*Nat'l Mining Ass'n v. Kempthorne*,
    512 F.3d 702 (D.C. Cir. 2008)...................................................................28

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008).............................................................8, 19

*New York v. United States*,
    505 U.S. 144 (1992)...................................................................................28

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) ................................................................12

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.*
    *Comm'n*,
    461 U.S. 190 (1983)...........................................................................27, 28

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ...........................................................................19, 20

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981)...........................................................23, 24

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)...................................................................................12

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976)...................................................................................23

*\*Util. Air Regulatory Grp. v. EPA*,
    134 S. Ct. 2427 (2014)................................................... 20, 24, 25, 26

*Wagner v. Taylor*,
    836 F.2d 566 (D.C. Cir. 1987).....................................................................9

vii

*West Virginia v. EPA*,
　　362 F.3d 861 (D.C. Cir. 2004) ........................................................8
*Whitman v. Am. Trucking Ass'ns*,
　　531 U.S. 457 (2001) ....................................................................22

## Statutes

5 U.S.C. § 705 ...............................................................................4

16 U.S.C. § 824(a) .......................................................................27

18 U.S.C. § 808(d) .......................................................................27

42 U.S.C. § 7607(b) .....................................................................10

42 U.S.C. § 7411(b) ........................................................ 18, 23, 24

*42 U.S.C. § 7411(d) ........ 1, 2, 3, 4, 5, 6, 7, 8, 16, 17, 18, 20, 22, 23, 24, 26, 27, 30

*42 U.S.C. § 7412 ...................................... 5, 6, 16, 17, 18, 19, 20, 29

## Rules

Fed. R. App. P. 21 .........................................................................1

Fed. R. App. P. 32 .........................................................................1

## Regulations

40 C.F.R. § 60.24 .........................................................................22

60 Fed. Reg. 65,387 (Dec. 19, 1995) ...........................................29

61 Fed. Reg. 9,905 (Mar. 12, 1996) .............................................26

69 Fed. Reg. 4,652 (Jan. 30, 2004) ..............................................17

*70 Fed. Reg. 15,994 (Mar. 29, 2005) ............................... 17, 18, 21

70 Fed. Reg. 28,606 (May 18, 2005) ............................................29

73 Fed. Reg. 44,354 (July 30, 2008) .............................................18

*77 Fed. Reg. 9,304 (Feb. 16, 2012) ..........................................6, 30

79 Fed. Reg. 34,830 (June 18, 2014) ............................................30

79 Fed Reg. 48,300 (Aug. 15, 2014) .............................................16

80 Fed. Reg. 21,301 (Apr. 17, 2015) .............................................15

Other Authorities

Brief of EPA, *New Jersey v. EPA*, No. 05-1097, 2007 WL 2155494 (D.C. Cir. July 23, 2007) ................................................................17

Comment Letter of 17 States, EPA-HQ-OAR-2013-0602-25433 (posted Dec. 15, 2014)................................................................21

*EME Homer City v. EPA*, Order, ECF 1350421, No. 11-1302, slip op. at *2 (D.C. Cir. Dec. 30, 2011) ................................................16

*EPA, Air Emissions from Municipal Solid Waste Landfills— Background Information for Final Standards and Guidelines, Pub. No. EPA-453/R-94-021 (1995) ........................................ 17, 18, 21

EPA, Legal Memorandum (June 2014) ..............................................17

Final Br. of West Virginia, et al., No. 14-1146, ECF 1540535 (D.C. Cir. Mar. 4, 2015) ................................................................21

Final Br. of Intervenor West Virginia, et al., No. 14-1112, ECF 1541358 (D.C. Cir. Mar. 9, 2015) ................................................21

InsideEPA, EPA Said To Target Early August for ESPS Release (July 13, 2015)) ................................................................16

Joby Warrick, *White House set to adopt sweeping curbs on carbon pollution*, Washington Post (Aug. 1, 2015)) ................................................1

Pub. L. No. 91-604, § 112, 84 Stat. 1676, 1685-86 (1970) ........................17

*State of Oklahoma ex rel. Pruitt v. McCarthy*, No. 15-5066, ECF 01019469736 at *1 (10th Cir.) ................................................2

*Authorities upon which Petitioners chiefly rely are marked with an asterisk.

**GLOSSARY**

| | |
|---|---|
| BSER | Best System of Emission Reduction |
| CAA | Clean Air Act |
| $CO_2$ | Carbon Dioxide |
| EPA | Environmental Protection Agency |
| HAP | Hazardous Air Pollutant |

## INTRODUCTION

This case involves the most far-reaching energy regulation in this nation's history, enacted by the federal *environmental* regulator, in which the agency has unusually chosen to immediately start the clock on the submission of State Plans even though it could be months before the States are permitted by statute to challenge the rule. Based upon an obscure and rarely used provision of the Clean Air Act ("CAA"), 42 U.S.C. § 7411(d), the Environmental Protection Agency ("EPA") issued on August 3, 2015, a final rule that is designed to "transfor[m] . . . the domestic energy industry."[1] The Section 111(d) Rule (Ex. 1) manifests EPA's policy judgment—never authorized by Congress—that coal-fired generation should be systematically disfavored. Beginning on August 3, States were given only thirteen months to design, draft, and submit at least initial State Plans, which must demonstrate how the State will replace coal-fired generation with entirely different sources such as natural gas, wind power, and solar power.

The States seek an emergency stay of the Rule's already-applicable deadlines through this Petition under the All Writs Act, rather than waiting for the Rule's publication in the Federal Register, because EPA has chosen to render the

---

[1] Joby Warrick, *White House set to adopt sweeping curbs on carbon pollution*, Washington Post (Aug. 1, 2015) (quoting "White House fact sheet"), http://www.washingtonpost.com/national/health-science/white-house-set-to-adopt-sweeping-curbs-on-carbon-pollution/2015/08/01/ba6627fa-385c-11e5-b673-1df005a0fb28_story.html.

publication date irrelevant. The Rule unusually imposes dates certain for the sub-mission of State Plans—September 6, 2016, and September 6, 2018—regardless of when the massive Rule is published. Final Rule at *38. With this firm deadline, the Rule requires States to spend significant and irrecoverable sovereign resources now to begin preparing their State Plans. EPA itself explained in the Rule that the unusual date-certain deadline "assure[s] that states begin to address the urgent needs for [carbon dioxide] reductions quickly." *Id.* Absent an immediate stay, the States are and will continue to be irreparably harmed by the displacement of sovereign priorities and the steps they must take to begin reordering the way their citizens receive and consume energy. As this Court held in *American Public Gas Association v. Federal Power Commission*, 543 F.2d 356 (D.C. Cir. 1976), a stay under the All Writs Act is appropriate in just such circumstances: when the party is being irreparably harmed by final agency action but is not yet permitted to challenge the action on the merits under the relevant statutory provision.

Waiting until publication to seek a stay would impose irreparable harms upon the States for an indeterminate period. EPA has represented that the National Archives and Records Administration will publish the 1,560-page final Section 111(d) Rule "in the normal course of business." ECF 01019469736 at *1, *State of Oklahoma ex rel. Pruitt v. McCarthy*, No. 15-5066 (10th Cir.). Recent experience with shorter rules, including those governing power plants, suggests that this

"normal course" could be as long as three or four months. When combined with the time necessary to adjudicate a stay motion filed after publication, requiring the States to wait until publication for a stay could mean that relief does not come until halfway through the States' period for preparing the September 6, 2016, submission. Neither the States nor this Court can know when publication will actually occur; yet all the while, the finite time for the submission of State Plans continues to run down, requiring the States to continue to work.

EPA should not be able to choose to put the risk of publication delay entirely upon the States, rather than itself. Where EPA has a choice under the law in imposing compliance deadlines, equity dictates that between the agency and the regulated parties, the agency should bear the risk of delay by tying compliance deadlines to the date of Federal Register publication. Otherwise, EPA could use the uncertain gap between finalization and publication to squeeze practical compliance from regulated parties before judicial review can begin—a tactic strikingly similar to the one that EPA touted after its recent Supreme Court loss in *Michigan v. EPA*.

For these reasons and the clearly unlawful nature of the Rule, this Court should issue a writ staying all of the Rule's already-applicable deadlines, including all State Plan deadlines, until litigation of the Rule's legality is complete. To ensure the least harm while permitting this Court sufficient time to consider this re-

3

quest, the States request a stay by Tuesday, September 8, 2015, approximately one year before the first State Plan submission deadline.[2]

## STATEMENT OF RELIEF SOUGHT

The States seek a stay of all the deadlines in the Final Rule, including the State Plan submission deadlines.

## STATEMENT OF THE ISSUE PRESENTED

Whether a writ should issue under the All Writs Act to stay all of the Section 111(d) Rule's deadlines, given that the deadlines are set to specific dates and not the date of the Rule's publication in the Federal Register, thereby requiring the States to work on State Plans for an indeterminate period before judicial review of the final Rule is available under the CAA.

## STATEMENT OF THE CASE AND FACTS

### I.    Statutory Overview

Section 111(d) of the CAA, 42 U.S.C. § 7411(d), provides a narrow program for the regulation of pollutants emitted from existing source categories.  If various preconditions are met, Section 111(d) grants to EPA authority to require States to establish "standards of performance" for existing sources, which standards "take

---

[2] On August 5, 2015, several of the States filed an application with EPA asking for an immediate stay of the Rule, pursuant to EPA's authority under 5 U.S.C. § 705. On August 7, EPA informed the States that the agency would not be granting the relief within the timeframe requested by the States.

4

into consideration, among other factors, the remaining useful life of the existing source to which such standard applies." *Id.* § 7411(d)(1)(B). Section 111(d) is a narrow, rarely used program invoked by EPA only five times in 35 years, and only once in the last 25 years. In those few cases, EPA aimed its regulations at pollutants from specialized industries, like acid mist emitted from sulfuric acid plants, and in each case EPA provided guidelines to States to impose traditional pollution control devices at those existing sources.

The primary reason that Section 111(d) has been so rarely used is the Section 112 Exclusion. As amended in 1990, this Exclusion prohibits EPA from invoking Section 111(d) for "any air pollutant . . . emitted from a source category which is regulated under [Section 112 of the CAA]." 42 U.S.C. § 7411(d)(1)(A). The Exclusion reflects the significant changes Congress made in 1990 to Section 112—a robust, commonly used program for EPA to regulate hazardous air pollutants ("HAPs") under national standards. Importantly, Congress changed the focus of Section 112 to source categories and expanded the definition of a HAP to language very similar to that in Section 111(d). *See infra*, at 17-18. The 1990 Amendments thus made a sensible policy judgment that if EPA has regulated an existing source category under Section 112's national standards, EPA may not then regulate that source category under Section 111(d)'s state-by-state standards.

5

## II.     The Final Section 111(d) Rule

On August 3, 2015, the Administrator signed the Final Section 111(d) Rule. Under the guise of imposing "standards of performance" on existing coal-fired power plants under Section 111(d), the Rule is based primarily on what EPA believes each State can achieve by shifting its energy portfolio away from coal-fired power and fossil fuels generally. Three features of the Rule are relevant here.

*First*, EPA justifies the Rule as a regulation of coal-fired power plants, even though those plants are extensively regulated under Section 112. *See* 77 Fed. Reg. 9,304 (Feb. 16, 2012) (imposing Section 112 regulations on power plants). As noted above, the Section 112 Exclusion prohibits EPA from regulating a source category under Section 111(d) where that category is "regulated under [Section 112]." 42 U.S.C. § 7411(d)(1)(A). Abandoning its position of the last 20 years, EPA now claims that "the phrase 'regulated under section 112' refers only to the regulation of HAP emissions." Final Rule at *267. And because EPA has not (yet) decided to regulate carbon dioxide as a HAP under Section 112, the agency argues that it may impose carbon dioxide limitations under Section 111(d) on power plants, regardless of whether EPA has regulated those plants under Section 112.

*Second*, the Section 111(d) Rule requires the States to fundamentally reorganize their energy grids, to reduce reliance on coal-fired power plants and fossil fuels more generally. EPA has mandated that the States design State Plans to

6

achieve carbon dioxide emissions targets that EPA calculated based on three "building blocks": (1) altering coal-fired power plants to increase their efficiency; (2) shifting reliance on coal-fired power to natural gas; and (3) shifting reliance on coal-fired power to low or zero-carbon energy generation like wind and solar. Final Rule at *230. Only the first block involves regulating the way existing power plants operate or perform. The remaining blocks represent across-the-board energy policy changes, aimed explicitly at reducing reliance on coal-fired energy, and the third block in particular seeks to shift away from fossil fuels more generally. As justification for this approach, EPA asserts that Section 111(d) authorizes the agency to base a rule on any measures that "shift[] generation from dirtier to cleaner sources." Final Rule at *325. That is, EPA believes that Section 111(d) permits it to force States to design plans that will shift a State's energy portfolio toward different, "cleaner" sources.

*Third*, EPA requires States to comply with the Section 111(d) Rule on an extremely aggressive schedule. By September 6, 2016, States must submit at least an initial State Plan that contains: (1) "an identification of final plan approach or approaches under consideration, including a description of progress made"; (2) an acceptable explanation for why the State requires more time to submit a final plan; and (3) "demonstration or description of opportunity for public comment on the initial submittal and meaningful engagement with stakeholders." Final Rule at

7

*1008-09. To achieve all of this, States must immediately begin a comprehensive study to determine the least costly type of plan that also assures electricity reliability. *See, e.g.*, McClanahan Decl. ¶ 4. That is the point, of course. As EPA says, the hard deadline and requirements are meant "to assure that states begin to address the urgent needs for reductions quickly." Final Rule at *73. If a State satisfies these requirements, it will have until September 6, 2018 to submit a final Plan.

Even including the two-year extension, EPA's schedule will be difficult to meet. EPA admits that developing State Plans under this Rule will require "technical work, state legislative and rulemaking activities, a robust public participation process, coordination with third parties, coordination among states involved in multi-state plans, and consultation with reliability entities." Final Rule at *38. Some States believe that three years may be insufficient to complete all of these steps. *See, e.g.*, Gross Decl. ¶ 3; Stevens Decl. ¶ 8. At a minimum, the States must begin working immediately, if they have any hope of meeting the initial 2016 deadline, and the final 2018 deadline. *See infra*, at 12-16.

## STANDING

The States have standing to challenge the Section 111(d) Rule, which obligates States to submit State Plans. *See West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004); *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008). Additional support for standing is offered in the attached declarations, as discussed below.

8

## REASONS FOR GRANTING THE WRIT

### I.    This Court Has Authority To Stay The Rule Under The All Writs Act

Under the All Writs Act, this Court has the authority to issue a writ staying an agency action until the Court formally obtains statutory jurisdiction. In general, the All Writs Act grants this Court jurisdiction where it "would have authority to review the agency's final decision." *In re Tennant*, 359 F.3d 523, 531 (D.C. Cir. 2004) (Roberts, J.); *accord In re al-Nashiri*, No. 14-1203, -- F.3d --, 2015 WL 3851966, at *3 (D.C. Cir. June 23, 2015). Included within that jurisdiction is the "limited judicial power to . . . maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels," because such a power is "merely incidental to the courts' jurisdiction to review final agency action." *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (quotation omitted); *accord Wagner v. Taylor*, 836 F.2d 566, 571 (D.C. Cir. 1987).

Accordingly, in *American Public Gas Association v. Federal Power Commission*, 543 F.2d 356 (D.C. Cir. 1976), this Court stayed an order of the Federal Power Commission that was final but not yet judicially reviewable under the statutory scheme. The Commission's order amending national rates for natural gas was final and effective on issuance, but was not statutorily reviewable until the end of the rehearing process. 543 F.2d at 358-59. This Court enjoined the application of the new rates because any payments made would be unrecoverable, due to the ab-

9

sence of a refund provision, "even if those new rates were later found to be unlawful upon full judicial review." *Id*. at 358.  Where there is irreparable harm from a final and effective agency order, this Court explained, relief under the All Writs Act is appropriate "to prevent even temporary immunity from judicial scrutiny of agency actions before statutory review provisions become available." *Id*.

Likewise, this Court has authority here to issue a writ staying the Section 111(d) Rule, which is final agency action but not yet reviewable.  The CAA permits this Court to review the final Section 111(d) Rule upon "promulgat[ion]" of that Rule, 42 U.S.C. §7607(b)(1), which means "publication in the *Federal Register*," *Horsehead Res. Dev. Co. v. EPA*, 130 F.3d 1090, 1093 (D.C. Cir. 1997). While that event has not occurred, and may not occur for months, *see infra*, at 15-16, this Court has power "incidental to [its] jurisdiction" under Section 7607(b)(1) to "maintain the status quo by injunction pending review of [the] agency's action through the prescribed statutory channels." *Dean Foods Co.*, 384 U.S. at 604.

This Court's recent decision in *In re Murray Energy*, 788 F.3d 330 (D.C. Cir. 2015), is not to the contrary.  In that case, the parties sought a writ prohibiting EPA from finalizing the Section 111(d) Rule.  This Court denied that petition, explaining that the Section 111(d) Rule was then "just a proposal." *Id*. at 334.  The Rule is now not just a proposal; it has been signed by the Administrator as "final" and imposes date-certain obligations upon the States. *See supra*, at 7.

10

## II.    An Order Under The All Writs Act Staying The Rule Should Issue

All three conditions for a writ are present. "First, the party seeking issuance of the writ . . . ha[s] no other adequate means to attain the relief he desires." *In re al-Nashiri*, 2015 WL 3851966, at *5 (quotation omitted). "Second, the petitioner . . . satisfy[ies] the burden of showing that his right to issuance of the writ is clear and indisputable." *Id.* And third, "the issuing court, in the exercise of its discretion, [should be] satisfied that the writ is appropriate under the circumstances." *Id.*

### A.    The States Have No Adequate Alternative To Prevent Irreparable Harm

To obtain relief under the All Writs Act, the petitioner must show that relief would prevent "irreparable harm." *See In re al-Nashiri*, 2015 WL 3851966, at *8 (equating the "no-other-adequate-means requirement" with showing of "irreparable harm"); *Cmty. Broad. of Boston, Inc. v. FCC*, 546 F.2d 1022, 1028 (D.C. Cir. 1976) ("In the exceptional case, where irreparable harm would indeed result, the movant may petition this court . . . under . . . the All Writs Act."); *Am. Public Gas*, 543 F.2d at 358 ("The All Writs Act is similarly applicable in instances where a court . . . is presented with an irreparable injury."). Irreparable harms to sovereign States, and which implicate federal-state relations, are especially compelling. *See Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001); *accord Cheney v. U.S. District Court*, 542 U.S. 367, 380 (2004) (All Writs Act relief particularly appropriate where structural constitutional rights are implicated).

11

Relevant here, irreparable injury includes economic injury from federal regulations. "[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (collecting cases). And because federal agencies have immunity from damages actions, it follows that economic harms imposed by federal regulations are also irreparable. *See, e.g.*, *Am. Public Gas*, 543 F.2d at 358; *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring).

If the deadlines in the Rule are not immediately stayed, the States will suffer significant unrecoverable costs and permanent disruption to sovereign priorities. As the States explained previously, these irreparable harms have already begun. But now that the Rule is final, the obligation to submit State Plans is indisputable and the harms will accelerate, including during the months it may take for the Final Rule to be published in the Federal Register.

State Plans are central to the Rule, covering almost 500 of the 1,560 pages. *See* Final Rule at *848-1312. Broadly speaking, States must choose between two plan types—emission rate- or mass-based, *id.* at *31-32—to satisfy EPA's aggressive emission targets. In a rate-based State Plan, States are to require affected

power plants to satisfy an average amount of carbon dioxide per unit of power produced. The required target would be impossible for any existing coal-fired power plant to meet and continue operating, unless that plant purchased emission credits from its "clean" competitors. *Id.* at *369-70; *see also id.* at *139. In mass-based State Plans, States are to cap the amount of carbon dioxide emissions that the whole sector of affected power plants can emit per year. This type of Plan must include some combination of enforceable emission limitations on power plants, additional policy programs such as increasing renewable energy and tightening energy efficiency standards, and emissions trading. *Id.* at *854, *897.

Absent a stay, the Rule will force States to make massive expenditures of time and resources designing State Plans. *See, e.g.*, Durham Decl. ¶ 6 (7,100 hours of 9 senior staff members); McClanahan Decl. ¶ 6 ($500,000 to $ 1 million on consultants alone); Gore Decl. ¶ 6 ($760,000 per year for several years). To design such Plans, States will need to conduct detailed interagency analyses and then consult with various stakeholders to determine what changes can plausibly be made to increase natural gas and add renewable energy generation. *See, e.g.*, Nowak Decl. ¶¶ 4-13; McClanahan ¶¶ 4-10. This process will include an assessment of the forms of energy available to the State, whether developing more new energy sources is feasible, and what changes to state law would be required. *See, e.g.*, Bracht Decl. ¶¶ 2, 8, 10, 12; McClanahan Decl. ¶¶ 5, 7-8; Hodanbosi Decl. ¶ 5;

Gore Decl. ¶¶ 5-6. In addition, because EPA's targets can be met through cooperative interstate regimes, States will need to engage in interstate consultation, determine the possible arrangements, and assess whether such arrangements are desirable. *See, e.g.*, Bracht Decl. ¶ 14; Stevens Decl. ¶ 10; Macy ¶ 5; Durham Decl. ¶ 8.

These expenditures will immediately redirect sovereign institutions away from serving the people, causing further irreparable harm. Designing the State Plans will take time away from environmental regulators' protection of the States' natural resources, *see, e.g.*, Durham Decl. ¶ 7, and from public utility commissions' safeguarding of consumers' energy needs, *see, e.g.*, Nowak Decl. ¶¶ 3, 6, 15; Bracht Decl. ¶¶ 3, 10-11, 13; McClanahan Decl. ¶¶ 5, 8, 10. Furthermore, making the State Plans legally enforceable is the first mandatory element of the Section 111(d) Rule. Final Rule at *939. In addition to any other necessary changes in law, this element of the Rule will require new legislation and even constitutional amendments. *See, e.g.*, Bracht Decl. ¶¶ 12-13; Nowak Decl. ¶¶ 7, 16; Gore Decl. ¶ 4; Hodanbosi Decl. ¶¶ 5, 8; McClanahan Decl. ¶ 4. Drafting, debating, and enacting such changes will mean legislators will not be able to design and implement their own sovereign objectives. *See, e.g.*, Bracht Decl. ¶ 13.

Importantly, the preparation of enforceable State Plans—and therefore the irreparable harm to States—cannot and will not wait to begin until the Rule is published in the Federal Register. *See, e.g.*, Stevens Decl. ¶¶ 5-10 ("[C]ompliance

14

planning and implementation must both begin immediately."); McClanahan Decl. ¶¶ 6-8 ("[C]ompliance planning must begin immediately."); Bracht Decl. ¶ 7-8 ("[E]valuation of specific compliance measures, such as new facilities or retirements, must also begin immediately."); Wreath Decl. ¶ 12 ("[Oklahoma] has no choice but to begin activities now to accommodate the [Final Rule]."). Regardless of the date of publication, States are required under the Rule to have made enough progress toward a State Plan by September 6, 2016, to meet the three initial criteria. *See supra*, at 7; *see, e.g.*, Stevens Decl. ¶¶ 6, 8-10. Work in preparing State Plans has thus already begun. *See, e.g.*, Wreath Decl. ¶¶ 2-11; Nowak Decl. ¶¶ 4-6. And even with the extension, final plans are due only two years later—which some States believe will not be enough time. Creating these State Plans is like nothing the States have ever undertaken, and the States believe it would take three to five years to complete the task. *See, e.g.*, Gross Decl. ¶ 3; Stevens Decl. ¶ 8.

EPA's unusual decision to tie the submission deadlines to specific dates, and not to publication of the Rule, only exacerbates the need for extraordinary relief because the States' obligations (and harms) have begun but it may be months before they can challenge the Rule. Recent experience with EPA rules impacting power plants—rules only a fraction of the 1,560 page Section 111(d) Rule—shows that the publication process can take several months. *See, e.g.*, Disposal of Coal Combustion Residuals From Electric Utilities, 80 Fed. Reg. 21,301 (Apr. 17, 2015)

15

(four months from signature to publication); Cooling Water Intake Structure, 79 Fed Reg. 48,300 (Aug. 15, 2014) (nearly three months from signature to publication).  And while EPA's General Counsel indicated in a letter to the States that the agency "is moving expeditiously to have the final rule published in the Federal Register," on the previous day the same General Counsel told the States on a conference call that EPA has no control over the Federal Register process.[3]  *See* Letter from Avi Garbow to Elbert Lin (Aug. 7, 2015).  Moreover, litigation over a motion for a stay filed upon publication could take additional months.  *See EME Homer City v. EPA*, Order, ECF 1350421, No. 11-1302, slip op. at *2 (D.C. Cir. Dec. 30, 2011) (granting motion to stay a rule filed four months previously).  During this delay—which could stretch more than half a year—States will suffer the massive expenditure of unrecoverable taxpayer resources and displacement of sovereign priorities described above.  *See supra*, at 11-16.

**B.    The States Are Clearly And Indisputably Entitled To Relief**

     **1.    The Section 111(d) Rule Violates The Section 112 Exclusion**

a.    The Section 112 Exclusion, as amended in 1990, prohibits EPA from regulating under Section 111(d) "any air pollutant" emitted from a "source catego-

---

[3] One news article has suggested that publication of this Rule may take several months.  InsideEPA, *EPA Said To Target Early August for ESPS Release* (July 13, 2015) ("[The Rule is] unlikely to appear in the Federal Register . . . until . . . climate talks in Paris in December.").

ry . . . regulated under [Section 112]." 42 U.S.C. § 7411(d)(1). As EPA has re-peatedly concluded, starting in the Clinton Administration and continuing to the Obama Administration's proposed version of this Rule, the "literal" terms of this text prohibit EPA from requiring States to regulate a source category under Section 111(d), when EPA regulates that source category under Section 112.[4] Or, as the Supreme Court has explained, "EPA may not employ [Section 111(d)] if existing stationary sources of the pollutant in question are regulated . . . under [Section 112]." *Am. Elec. Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527, 2537 n.7 (2011).

The current Exclusion reflects the dramatic changes that Congress made to Section 112 in 1990. Before the 1990 Amendments, Section 112 and Section 111(d) were complementary provisions, each covering different pollutants. While Section 112 applied only to an extremely narrow category of pollutants, Section 111(d) applied to all pollutants not covered by Section 112 or the CAA's National Ambient Air Quality Standards.[5] But in 1990, Congress changed the focus of Sec-tion 112 from individual pollutants to source categories, and also vastly expanded

---

[4] *See* EPA, Legal Memorandum at 26 (June 2014); Brief of EPA, *New Jersey v. EPA*, No. 05-1097, 2007 WL 2155494 (D.C. Cir. July 23, 2007); 70 Fed. Reg. 15,994, 16,031 (Mar. 29, 2005); 69 Fed. Reg. 4,652, 4,685 (Jan. 30, 2004); EPA, Air Emissions from Municipal Solid Waste Landfills—Background Information for Final Standards and Guidelines, Pub. No. EPA-453/R-94-021, 1-5–1-6 (1995).

[5] Before 1990, Section 112 applied to pollutants that "may cause, or contribute to, an increase in mortality or an increase in serious irreversible[] or incapacitating re-versible[] illness." Pub. L. No. 91-604, § 112, 84 Stat. 1676, 1685-86 (1970).

17

the pollutants covered under Section 112 with language very similar to that in Section 111(d).[6] *See supra*, at 5. Since 1990, EPA has never identified any pollutant that falls within one definition but not the other, including carbon dioxide.[7]

Given the fundamental change in the relationship between Sections 112 and 111(d), Congress sensibly revised the Exclusion to prohibit EPA from regulating under Section 111(d) any "source category . . . regulated under [Section 112]." 42 U.S.C. § 7411(d)(1). As EPA itself has explained, the House of Representatives—which originated the 1990 revision to the Exclusion—"sought to change the focus of section 111(d) by seeking to preclude regulation of those pollutants that are emitted from a particular source category that is actually regulated under section 112." 70 Fed. Reg. at 16,031. The revision reflected the "desire . . . to avoid duplicative regulation" of existing source categories—especially power plants—in light of the significant capital investments that these facilities have made in their operations. 70 Fed. Reg. at 16,032. Under the revised Exclusion, such facilities would not be forced to comply with the stringent Section 112 regulations imposed by EPA, as well as state-by-state regulations under Section 111(d).

---

[6] *Compare* 42 U.S.C. § 7412(b)(2) (any pollutants "which present, or may present . . . a threat of adverse human health effects . . . or adverse environmental effects . . ."), *with* 42 U.S.C. § 7411(b)(1)(A) (any pollutants "which may reasonably be anticipated to endanger public health or welfare").

[7] *See* 73 Fed. Reg. 44,354, 44,493-95 (July 30, 2008).

With the expansion of the Section 112 program, there was little need for Section 111(d). Indeed, since 1990, EPA has never before contended that it needed to regulate the same source category under both Sections 112 and 111(d). EPA has only used Section 111(d) for two regulations since 1990. In the first, it unsuccessfully sought to undo a Section 112 regulation to impose a Section 111(d) regulation of the same source category. *See New Jersey v. EPA*, 517 F.3d 574, 583-84 (D.C. Cir. 2008). In the second, EPA justified its rule by specifically noting that the source category was not "actually being regulated under section 112."[8]

b.    In the Final Rule, EPA concedes that under the States' reading of the Exclusion, the Section 111(d) Rule is illegal. Acknowledging that it previously shared the same interpretation of the text, EPA admits that "[t]he effect of this reading would be to preclude the regulation of $CO_2$ from power plants under CAA section 111(d) because power plants have been regulated for (HAP) under CAA section 112." Final Rule at *263.[9]

EPA seeks to save the Rule by adopting an interpretation of the phrase "regulated under [Section 112]" that the agency never suggested before litigation in this Court this year. Specifically, the agency concludes that the Exclusion "only

---

[8] *See* 1995 EPA Landfill Memo, at 1-6.

[9] This Court's upcoming decision on remand from *Michigan v. EPA*, 135 S. Ct. 2699 (2015), thus cannot have any impact on the Section 111(d) Rule's legality because agency action can only be upheld on the "grounds upon which [EPA] itself based its action." *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

exclud[es] the regulation of HAP emissions under CAA section 111(d) and only when th[e] source category [at issue] is regulated under CAA section 112." Final Rule at *267. That is because, in EPA's new view, "the phrase 'regulated under section 112' refers only to the regulation of HAP emissions." *Id.*

This contrived reading—invented by EPA after two decades of reading the text "literal[ly]"—is indefensible. Section 111(d) permits the regulation of "any air pollutant" "which is not . . . emitted from a source category . . . regulated under [Section 112]." 42 U.S.C. § 7411(d)(1). The meaning is clear: if a source category is "regulated under [Section 112]," EPA cannot use Section 111(d) to reach an air pollutant emitted from that source category. EPA's new interpretation would re-write the plain terms of "regulated under [Section 112]" to be "regulated under [Section 112] *and a HAP*." But EPA may not "rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) ("*UARG*").

c.    As an alternative, EPA falls back on the "differing amendments" theory of the Section 112 Exclusion, which was once the lynchpin of EPA's attempt to re-write the Exclusion. *See* Final Rule at *266 n.294. But the very idea that there are two amendments, giving rise to two potentially conflicting versions of the Exclusion, is simply wrong. EPA's claim stems from the fact that an obsolete attempt to correct a cross-reference, to account for other changes made to the CAA in

20

1990, was left in the 1990 Amendments by mistake.  The U.S. Code properly takes no account of this trivial error, consistent with uniform legislative practice.

EPA has taken the remarkable position that the existence of this admitted "drafting error" (70 Fed. Reg. at 16,031) creates a version-in-exile of the Exclusion that must be reconciled with the version of the Exclusion in the U.S. Code.  Final Rule at *247.  But it is well established that an error updating a cross reference is given no substantive meaning.  *See Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1336-37 (D.C. Cir. 2013).  Commenters pointed out to EPA that such errors are common in modern complex legislation,[10] and the agency has still not identified a single case or decision, by any court or agency, giving such an error any meaning.  As the Clinton-era EPA concluded just five years after the 1990 Amendments to the CAA, this error must be ignored because it "is a simple substitution of one sub-section citation for another, without consideration of other amendments of the section in which it resides."  1995 EPA Landfill Memo at 1-5.[11]

---

[10] *See, e.g.*, Final Br. of West Virginia, et al., No. 14-1146, ECF 1540535, at *42-44 (D.C. Cir. Mar. 4, 2015); Final Br. of Intervenor West Virginia, et al., No. 14-1112, ECF 1541358, at *11-12 (D.C. Cir. Mar. 9, 2015); Comment Letter of 17 States, EPA-HQ-OAR-2013-0602-25433, at *5-6 (posted Dec. 15, 2014).

[11] Even under EPA's view that there are two amendments that must be reconciled, the way to do so is to give both amendments full meaning, which would still prohibit EPA from regulating the same power plants under both Sections 112 and 111(d).  *See, e.g.*, Final Br. of West Virginia, et al., No. 14-1146, ECF 1540535, at *48-51 (D.C. Cir. Mar. 4, 2015).

2.    EPA Cannot Require States To Reorganize Their Energy Economies Under Its Novel "Building Block" Approach

EPA's "building block" approach, which requires States to reorder their energy sectors to reduce usage of coal-fired energy, is illegal in several respects:

a. Statutory Text.    Section 111(d) only authorizes regulation based on measures, such as pollution control technologies, for the more efficient operation of an existing source of emissions. Under Section 111(d), EPA may direct States to establish "standards of performance *for any existing source*," under certain narrow circumstances. 42 U.S.C. § 7411(d)(1)(A) (emphasis added). A "standard of performance" is "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable *through the application* of the best system of emission reduction ['BSER']." *Id.* § 7411(a)(1) (emphasis added). Moreover, "in applying a standard of performance *to any particular source*," a State may "take into consideration, among other factors, the remaining useful life of *the existing source* to which such standard applies." *Id.* § 7411(d)(1)(B) (emphases added). Such "other factors" include "[p]hysical impossibility of installing necessary control equipment." 40 C.F.R. § 60.24(f)(2). Section 111(d) thus requires a BSER that is capable of "application" to the "existing source," while requiring consideration of "other factors," such as the "remaining useful life" of that source.

These statutory provisions make clear that a BSER is not an unmitigated grant of roving authority to EPA. *See Whitman v. Am. Trucking Associations*, 531

U.S. 457, 468 (2001). Rather, it is simply one of the CAA's many requirements for the adoption of "pollution control devices" (*Union Elec. Co. v. EPA*, 427 U.S. 246, 257 (1976)) or other measures that "hold the industry to a standard of improved design and operational advances" (*Sierra Club v. Costle*, 657 F.2d 298, 364 (D.C. Cir. 1981)). Even EPA understands as much; its BSER under Section 111(b) for *new* coal-fired power plants is a pollution control device.[12]

Building blocks 2 and 3 of the Rule go far beyond EPA's authority to require States to develop standards of performance for the source category in question. Rather than requiring "improved design and operational advances," *Costle*, 657 F.2d at 364, the Rule mandates far-reaching measures aimed at reducing usage of coal-fired energy by increasing reliance upon competing sources of energy: natural gas and, especially, renewable energy such as solar power and wind. These are economy-wide energy policy mandates, which simply disfavor coal-fired power plants and favor other source categories. On this reasoning, the agency could mandate that States require all coal-fired power plants to close, if the "integrated" power grid can produce sufficient electricity from other "cleaner" sources to sup-

---

[12] Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources: Electric Generating Units, EPA-HQ-OAR-2013-0495 & EPA-HQ-OAR-2013-0603, at 13-14, tbl. 1 (Aug. 3, 2015) ("Final Section 111(b) Rule"), http://www.epa.gov/airquality/cpp/cps-final-rule.pdf.

ply the nation.  That is not a "standard of performance" for power plants, but one
of *non*-performance.

A comparison of the target emission rates for new power plants under the
Section 111(b) Rule and those for existing power plants under this Rule, issued on
the same day, demonstrates starkly that EPA is not simply seeking to regulate ex-
isting coal-fired power plants.  The target emission rates for existing power plants
are lower than those for new power plants, even though it generally would be ex-
pected that it would be easier to incorporate new technology and operational
measures into a not-yet-built power plant than to retrofit an existing one.  *Compare*
Final Section 111(d) Rule at *28 (1,305 lb $CO_2$/MWh) *with* Final Section 111(b)
Rule at *15 (1,400 lb $CO_2$/MWh).  That unprecedented disparity can only be ex-
plained by the fact that EPA is going well beyond requiring existing power plants
to adopt "improved design and operational advances," *Costle*, 657 F.2d at 364, but
rather is requiring system-wide changes to increase reliance on entirely different
sources, in order to reduce utilization of the source category in question.

b. Decisions Of Vast Economic And Political Significance Without Clear
Congressional Authorization.  In *UARG*, the Supreme Court held that Congress
must "speak clearly if it wishes to assign to an agency decisions of vast 'economic
and political significance.'"  134 S. Ct. at 2444 (quoting *FDA v. Brown & William-*
*son Tobacco Corp.*, 529 U.S. 120, 160 (2000)); *accord King v. Burwell*, 135 S. Ct.

2480, 2489 (2015). The Court barred EPA from regulating under the Prevention of Significant Deterioration and Title V programs "the construction and modification of tens of thousands, and the operation of millions, of small [carbon dioxide] sources nationwide." *UARG*, 134 S. Ct. at 2444. Such regulation would "bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization." *Id*. "[W]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" the Court stressed, "[courts should] greet its announcement with a measure of skepticism." *Id*. (quoting *Brown*, 529 U.S. at 159).

This is fatal to the Section 111(d) Rule. Invoking authority under a statutory provision it has utilized on only five previous occasions, EPA has arrogated to itself the power to "drive a more aggressive transformation in the domestic energy industry,"[13] in order to reduce demand for America's most common energy source. As part of this claimed authority, the agency has mandated the increased usage of natural gas and renewable sources. This is broad-based energy policy, not environmental regulation. EPA claims to have "discover[ed] in a long-extant statute an unheralded power to regulate a significant portion of the American economy." *UARG*, 134 S. Ct. at 2444 (internal quotations omitted). But there is no evidence

---

[13] *See supra* note 1.

25

that Congress "clearly" assigned to EPA the authority to make these energy policy decisions of "vast economic and political significance." *Id.* (quotations omitted).

The implications of EPA's interpretation of Section 111(d) are staggering and go well beyond even EPA's claim of authority in *UARG*. The Rule relies entirely upon EPA's assertion that Section 111(d) gives it the right to mandate "shifting generation from dirtier to cleaner sources." Final Rule at *325. But consider the consequences of that position. In its most recent successful Section 111(d) regulation, EPA required States to impose standards of performance for municipal solid waste landfills. *See* 61 Fed. Reg. 9,905 (Mar. 12, 1996). Under EPA's new theory of Section 111(d), the Agency could now update those standards to require States to adopt measures that require recycling rather than disposal of trash, including forcing landfills to buy "credits" from recycling plants, on the theory that recycling plants are "cleaner" than landfills. Final Rule at *325. After all, according to EPA, the "management of the resulting waste . . . release[s] greenhouse gas emissions such as carbon dioxide."[14] In short, EPA's novel interpretation of Section 111(d) would transform this environmental regulator into the most powerful central planner in the federal bureaucracy—with the authority to decide that any source category is "cleaner" than its competitor category, and to require the States to systematically favor the supposedly "cleaner" category of competitors.

---

[14] EPA, Reducing Waste at http://www.epa.gov/greenhomes/ReduceWaste.htm.

    c.   States' Constitutional Rights Over Intrastate Energy Production And Consumption.  EPA's claim that Section 111(d) permits the agency to reorganize the nation's energy economy on a state-by-state basis must also be rejected because it violates the Tenth Amendment.  States' authority over the intrastate generation and consumption of electricity is "one of the most important functions traditionally associated with the police powers of the States." *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983).  Congress recognized this State authority in the Federal Power Act ("FPA"), which confines federal authority over electricity markets to "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce." 16 U.S.C. § 824(a); *see also id.* § 824(b)(1).  Regulation of the intrastate consumer market remains where it constitutionally belongs: in the hands of the States.  The FPA and other federal energy statutes respect the States' "traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost and other related state concerns." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983); *cf.* 18 U.S.C. § 808(d)(2)(A).

    The Section 111(d) Rule runs roughshod over States' constitutional rights regarding intrastate generation and use of electricity, and is thus illegal.  Blocks 2 and 3 require States to fundamentally alter electricity generation for intrastate use.

27

These State-based energy policies have deep implications for the intrastate "[n]eed for new power facilities, their economic feasibility, and rates and services." *Id.*; *see also* Nowak Decl. ¶ 7; McClanahan Decl. ¶¶ 5, 11; Bracht Decl. ¶ 13.

That the Section 111(d) Rule leaves States the option of not submitting State Plans does not cure these constitutional problems. If States comply and submit State Plans to reorganize their energy economies, they will become mere "administrative agencies of the Federal Government" in this critical area of state authority. *New York v. United States*, 505 U.S. 144, 188 (1992). On the other hand, if States refuse to submit State Plans, EPA will impose its own federal plan, imposing a federal takeover of the generation of intrastate energy. Not even Congress is permitted to enact a so-called "cooperative federalism" regime if both choices exceed Congress's direct regulatory power. *Id.* at 167 (quotations omitted).

At a minimum, EPA's interpretation of the statute must fail in light of these constitutional issues. *See Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) ("[W]e will not submit to an agency's interpretation of a statute if it presents serious constitutional difficulties." (quotations omitted)). Put another way, to the extent this Court concludes that Section 111(d) could be read to adopt EPA's reading—which it cannot, *see supra*, at 16-21—"basic principles of federalism embodied in the Constitution . . . resolve [any] ambiguity" against EPA's interpretation. *Bond v. United States*, 134 S. Ct. 2077, 2090 (2014).

28

### C.    The Court Should Exercise Its Discretion To Issue The Writ

In addition to issuing the writ to remedy irreparable sovereign harms to the States, *see supra*, at 11-16, this Court should exercise its discretion in order to stop EPA from forcing the regulated community to irrevocably alter its operations during litigation. After the Supreme Court in *Michigan v. EPA* held that the agency violated the law in its Section 112 regulation of power plants, EPA boasted in its official blog that "the majority of power plants are already in compliance or well on their way to compliance."[15] The Section 111(d) Rule is designed to have an even more significant impact on coal-fired power plants than the Section 112 regulations.

This concern is particularly relevant here, where EPA has taken the highly unusual step of choosing to de-link the compliance deadlines from the date of publication. EPA has deliberately and voluntarily chosen to place upon States and other regulated parties the risk of publication delay, which is potentially quite prejudicial given the Rule's length. Notably, the agency did not do the same in prior Section 111(d) rules or in the Section 112 Rule, to reference just the rules otherwise discussed in this Petition. *See, e.g.*, 70 Fed. Reg. 28,606, 28,649 (May 18, 2005) (state plans due 18 months after publication); 60 Fed. Reg. 65,387, 65,414

---

[15]    https://blog.epa.gov/blog/2015/06/in-perspective-the-supreme-courts-mercury-and-air-toxics-rule-decision/.

29

(Dec. 19, 1995) (state plans due 9 months after publication); 77 Fed. Reg. 9,304, 9,418 (Feb. 16, 2012) (compliance date 3 years and 60 days after publication).

Nor is there any compelling reason to deny the narrow relief the States have requested here. Given that EPA has repeatedly missed its own deadlines as to the Section 111(d) Rule, the agency cannot possibly claim any need for the Rule's deadlines to go into effect immediately. *See* Settlement Agreement ¶¶ 3-4 (committing that EPA "will sign" a proposed Section 111(d) by July 26, 2011, and the final rule by May 26, 2012) (No. 14-1146, ECF 1540020, JA 3); 79 Fed. Reg. 34,830, 34,838 (June 18, 2014) ("EPA expects to finalize this rulemaking by June 1, 2015."); *In re Murray Energy Corp.*, 788 F.3d 330, 339 (D.C. Cir. 2015) (Henderson, J., concurring) ("EPA has represented that it will promulgate a final rule before this opinion issues."). In any event, because the Section 111(d) Rule is illegal, EPA has no cognizable interest in the compliance with its deadlines. *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate").

## CONCLUSION

For the foregoing reasons, the States respectfully request that this Court issue a writ staying the State Plan submission deadlines in the Section 111(d) Rule.

Dated: August 13, 2015                Respectfully submitted,

Patrick Morrisey
   Attorney General of West Virginia
Elbert Lin
   Solicitor General
   *Counsel of Record*
Misha Tseytlin
   General Counsel
J. Zak Ritchie
   Assistant Attorney General
State Capitol Building 1, Room 26-E
Tel. (304) 558-2021
Fax (304) 558-0140
Email: elbert.lin@wvago.gov
*Counsel for Petitioner State of West Virginia*

Luther Strange
   Attorney General of Alabama
Andrew Brasher
   Solicitor General
   *Counsel of Record*
501 Washington Ave.
Montgomery, AL 36130
Tel. (334) 590-1029
Email: abrasher@ago.state.al.us
*Counsel for Petitioner*
   *State of Alabama*

Leslie Rutledge
   Attorney General of Arkansas
Jamie L. Ewing
   Assistant Attorney General
   *Counsel of Record*
323 Center Street, Ste. 400
Little Rock, AR 72201
Tel. (501) 682-5310
Email: joe.cordi@arkansasag.gov
*Counsel for Petitioner*
   *State of Arkansas*

Pamela Jo Bondi
   Attorney General of Florida
Allen Winsor
   Solicitor General

Gregory F. Zoeller
   Attorney General of Indiana
Timothy Junk
   Deputy Attorney General

31

Counsel of Record
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel. (850) 414-3681
Fax (850) 410-2672
Email:
allen.winsor@myfloridalegal.com
**Counsel for Petitioner**
  **State of Florida**

Derek Schmidt
  Attorney General of Kansas
Jeffrey A. Chanay
  Chief Deputy Attorney General
  Counsel of Record
120 SW 10th Avenue, 3d Floor
Topeka, KS 66612
Tel. (785) 368-8435
Fax (785) 291-3767
Email: jeff.chanay@ag.ks.gov
**Counsel for Petitioner**
  **State of Kansas**

James D. "Buddy" Caldwell
  Attorney General of Louisiana
Megan K. Terrell
  Deputy Director, Civil Division
  Counsel of Record
1885 N. Third Street
Baton Rouge, LA 70804
Tel. (225) 326-6705
Email: TerrellM@ag.state.la.us
**Counsel for Petitioner**
  **State of Louisiana**

Counsel of Record
Indiana Government Ctr. South, Fifth
Floor
302 West Washington Street
Indianapolis, IN 46205
Tel. (317) 232-6247
Email: tim.junk@atg.in.gov
**Counsel for Petitioner**
  **State of Indiana**

Jack Conway
  Attorney General of Kentucky
  Counsel of Record
700 Capital Avenue
Suite 118
Frankfort, KY 40601
Tel: (502) 696-5650
Email: Sean.Riley@ky.gov
**Counsel for Petitioner**
  **Commonwealth of Kentucky**

Bill Schuette
  Attorney General of Michigan
Aaron D. Lindstrom
  Michigan Solicitor General
  Counsel of Record
P.O. Box 30212
Lansing, MI 48909
Tel. (515) 373-1124
Fax (517) 373-3042
Email: LindstromA@michigan.gov
**Counsel for Petitioner**
  **State of Michigan**

32

Doug Peterson
  Attorney General of Nebraska
Dave Bydlaek
  Chief Deputy Attorney General
Justin D. Lavene
  Assistant Attorney General
  *Counsel of Record*
2115 State Capitol
Lincoln, NE 68509
Tel. (402) 471-2834
Email: justin.lavene@nebraska.gov
**Counsel for Petitioner**
  **State of Nebraska**

Michael DeWine
  Attorney General of Ohio
Eric E. Murphy
  State Solicitor
  *Counsel of Record*
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel. (614) 466-8980
Email:
  eric.murphy@ohioattorneygeneral.gov
**Counsel for Petitioner**
  **State of Ohio**

E. Scott Pruitt
  Attorney General of Oklahoma
Patrick R. Wyrick
  Solicitor General
  *Counsel of Record*
P. Clayton Eubanks
  Deputy Solicitor General
313 N.E. 21st Street
Oklahoma City, OK 73105
Tel. (405) 521-3921
Email: Clayton.Eubanks@oag.ok.gov
**Counsel for Petitioner**
  **State of Oklahoma**

Marty J. Jackley
  Attorney General of South Dakota
Steven R. Blair
  Assistant Attorney General
  *Counsel of Record*
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel. (605) 773-3215
Email: steven.blair@state.sd.us
**Counsel for Petitioner**
  **State of South Dakota**

Brad Schimel
  Attorney General of Wisconsin
Andrew Cook
  Deputy Attorney General
Daniel P. Lennington
  Assistant Attorney General
    *Counsel of Record*
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53707
Tel: (608) 267-8901
Email: lenningtondp@doj.state.wi.us
***Counsel for Petitioner
  State of Wisconsin***

Peter K. Michael
  Attorney General of Wyoming
James Kaste
  Deputy Attorney General
    *Counsel of Record*
Michael J. McGrady
  Senior Assistant Attorney General
123 State Capitol
Cheyenne, WY 82002
Tel. (307) 777-6946
Fax (307) 777-3542
Email: james.kaste@wyo.gov
***Counsel for Petitioner
  State of Wyoming***

## CERTIFICATE OF COMPLIANCE

This petition complies with Federal Rule of Appellate Procedure 21(d) because it does not exceed 30 pages, excluding the parts of the brief exempted by 21(d). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Elbert Lin

## CERTIFICATE OF SERVICE

I certify that on this 13th day of August, 2015, a copy of the foregoing

*Emergency Petition For An Extraordinary Writ* will be served by electronic service

as follows:

Amanda Shafer Berman
United States Department of Justice
Environmental Defense Section
601 D St. NW, Ste. 8000
Washington DC 20004
202-514-1950
amanda.berman@usdoj.gov

Eric Hostetler
Eric.Hostetler@usdoj.gov


Elbert Lin

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

Petitioners,

Case No. 15-_____

On Petition for Extraordinary Writ to the
United States Environmental Protection Agency

# PETITIONERS ADDENDUM

Patrick Morrisey
    Attorney General of
    West Virginia

State Capitol
Building 1, Room 26-E
Tel. (304) 558-2021
Fax (304) 558-0140
Email: elbert.lin@wvago.gov

Elbert Lin
    Solicitor General
    *Counsel of Record*

Misha Tseytlin
    General Counsel

J. Zak Ritchie
    Assistant Attorney General

*Counsel for Petitioner State of West Virginia*

# CONTENTS

Exhibit 1: Final Section 111(d) Rule (on CD)

Bracht Declaration……………………………………………………………………1

Durham Declaration……………………………………………………………...9

Easterly Declaration……………………………………………………………17

Gore Declaration……………………………………………………………...25

Gross Declaration……………………………………………………………...29

Hodanbosi Declaration……………………………………………………….35

Lyons Declaration……………………………………………………………….44

Macy Declaration……………………………………………………………….48

McClanahan Declaration……………………………………………………….52

Nowak Declaration………………………………………………...……………58

Stevens Declaration…………………………………………………………….70

Wreath Declaration……………………………...…………………………….76

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

               Petitioners.

Case No. 15-_____

## DECLARATION OF DAVID L. BRACHT, DIRECTOR,
## NEBRASKA ENERGY OFFICE

I, David L. Bracht, declare as follows:

1.        I am the Director of the Nebraska Energy Office ("NEO"). I have been employed at the NEO since January 2015. I have over 30 years of business, government and legal experience, including as a senior executive in private industry and government agencies and, for the last 10 years, as a private practice attorney working in the energy industry. As part of my duties, I have authority to monitor, track, and interact with stakeholders and regulators on the development

P000001

and implementation of state and federal environmental rules impacting public utilities.

2. I have personal knowledge to understand what steps Nebraska has taken and will likely need to take in response to the EPA's Section 111(d) Rule, including future resource planning for system reliability. In general, the Section 111(d) Rule will dramatically transform the way electric power will be generated and transmitted to consumers in Nebraska and throughout the United States. The Rule will, at the very least, require the construction of new power generation and transmission facilities and associated infrastructure, the updating or decommissioning of existing power generation and transmission facilities that are not fully depreciated, and changes to the electric power system that will affect the availability, cost and reliability of electric power for every single current and future consumer. In short, the Section 111(d) Rule will transform the American energy economy.

3. Based on my work experience and position, I have determined that implementing the Section 111(d) Rule will be a complicated, time consuming, and expensive endeavor, which will require the expenditure of substantial State resources, immediately and over the next calendar year.

4. Significant NEO resources have already been invested to understand and evaluate the proposed 111(d) Rule. NEO employees have spent approximately

2

300 hours understanding the rule and preparing for implementation, including outreach to Nebraska stakeholders, organizing stakeholder meetings and listening sessions, participating in regional collaboratives such as the National Association of State Energy Officials and the Midwest Energy Efficiency Association with other states and industry participants, and in-depth analysis of the impact of the Section 111(d) Rule on the state and regional systems.

5.      NEO employees and consultants will be required to spend additional time and resources modeling the changes made from the proposed to the final Section 111(d) rule.  The purpose of this model will be to forecast the cost of the changes in the Nebraska utility market that are necessary to comply with the Section 111(d) Rule, and the resulting impact on electric rates and overall economic growth.

6.      Based on my knowledge and experience, the Section 111(d) Rule represents an unprecedented infringement by the EPA on the traditional authority of Nebraska to manage energy resources within our jurisdiction because the mandates of the Section 111(d) require NEO to undertake specific changes to how energy is provided to consumers.  The Section 111(d) Rule also disrupts the well-settled division of authority over electricity markets under the Federal Power Act, and raises significant uncertainty about the role of the Federal Energy Regulatory Commission to ensure the reliability of electricity through the wholesale market.

3

7.    Absent a stay from this Court, compliance planning must begin immediately.  The system-wide changes necessary for compliance must be gradual to preserve reliability of the electric grid.  Because compliance is calculated based on a rolling average, the longer Nebraska waits to begin compliance, the more expensive and difficult it will be to meet the requirements of the Rule.

8.    Absent a stay from this Court, evaluation of specific compliance measures, such as new facilities or retirements, must also begin immediately.   The lengthy application and approval process for utilities to construct, upgrade, or retire facilities to comply with the Section 111(d) Rule, as well as the in-depth evaluation of public necessity and convenience for each facility, requires utilities to plan and submit applications for upgrades almost immediately after publication of the final Section 111(d) Rule in order to have equipment constructed, upgraded, or decommissioned before the compliance period begins in 2022.

9.    Absent a stay from this Court, the NEO will need to spend approximately 700 hours over the next calendar year as a direct result of the Rule.  The expenditure of these resources must begin immediately.  This process includes the development of studies required by state statute to evaluate and estimate the impact on rates and reliability, and the resulting impact on economic development caused by potential retirements and replacements of generation and transmission facilities.

4

10.    Absent a stay from this Court, the Section 111(d) Rule will also severely threaten reliability and increase the cost of electricity by forcing Nebraska to move immediately toward reliance on a limited number of fuel sources. The risks associated with this type of system-wide transformation will occur in the next year, unless the Rule is stayed. The threats posed by this shift in resources and transformation of Nebraska's existing power system are particularly significant in the more sparsely populated rural areas of Nebraska that have limited transmission capabilities. The rural areas will also face a significant economic burden due to more limited tax base and the distributed nature of Nebraska's public power system. Nebraska's relatively small total population will also limit the resources available for implementing this significant change, thereby increasing the impact on ratepayers resulting in a negative impact on the entire state economy.

11.    Changes made for the sake of compliance with the Section 111(d) Rule immediately and over the next calendar year will be irreversible and will impact the electric grid for decades. System planning is typically based on the 30-40 year lives of generation and transmission facilities. Building, redesigning, and adjusting power generation facilities takes years, and decisions made in these areas are often irreversible once they are made. For example, the decision to prematurely retire an electric generating unit could have significant consequences for system reliability and may unnecessarily increase costs to ratepayers for

5

decades to come.  This is particularly true because of Nebraska's relatively small total population and the significant areas of the state that are sparsely populated.

12.     Absent a stay from this Court, implementation of the Section 111(d) Rule will require legislative and constitutional changes on the state level that may permanently alter the daily operation of utilities.  Specifically, the Section 111(d) Rule includes control measures outside of the physical location and control of electric generating units, such as end-use energy efficiency (reduced energy use by electricity consumers), demand response (usage changes according to instantaneous market and load-profile changes), and increased distributed generation (such as small residential renewable installations).  Nebraska would have to immediately set in motion the chain of events, including statutory changes, larger investment in customer-side behavior, and further rate restructuring, in order for these compliance options to contribute to the Section 111(d) Rule's emission reduction targets.

13.     Nebraska is the only state in which 100% of electric power is provided by municipalities, public power districts and electric cooperatives.  The 167 independent public power entities in Nebraska have separate boards of directors, in most cases elected by the local ratepayers.  Imposing the top-down control will disrupt and undermine Nebraska's commitment to local public control that has proven valuable over its 80 year history.  Undertaking these measures will

6

seriously disrupt the State's sovereign priorities, which would otherwise be devoted to addressing other pressing issues of public concern.

14.     Absent a stay from this Court, if Nebraska chooses to adopt a multi-state approach to complying with the Section 111(d) Rule, changes to rights and responsibilities of entities such as Regional Transmission Organizations ("RTOs") and Independent System Operators ("ISOs") will be immediately and long lasting. If Nebraska joins in a multi-state compliance approach, it is likely to take the form of credit trading or an induced carbon price through the RTO. The members of these organizations must follow a prescribed stakeholder process to effect the changes, and Nebraska must agree to grant certain enforcement powers to those organizations. The stakeholder process and any necessary institutional changes for these organizations will likely need to be completed before a plan relying on those third parties can be submitted for approval to the EPA. These processes are lengthy, difficult to reverse once established, and will require immediate expenditure of resources over next calendar year.

P000007

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August ___5___, 2015.

David L. Bracht
Director, Nebraska Energy Office

8

P000008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

        Petitioners.

Case No. 15-_____

---

## DECLARATION OF WEST VIRGINIA,
## DEPARTMENT OF ENVIRONMENTAL PROTECTION

---

I, William F. Durham, declare as follows:

    1.      I am the Director of the Division of Air Quality at the West Virginia Department of Environmental Protection (DEP). I have been employed at the DEP for over 23 years. For the most recent 10 years, I have been responsible, in a supervisory capacity, for the development of state plans and revisions thereto submitted to the U.S. Environmental Protection Agency (EPA) pursuant to the Clean Air Act (CAA) as amended. 42 U.S.C.A §§ 7401 - 7671q. These include

revisions to the State Implementation Plan (SIP) pursuant to CAA §110 and plans, or revisions to plans, pursuant to CAA §111. During my tenure, I have overseen the development of a multitude of state plans which were submitted to EPA for approval, including every SIP revision or state plan West Virginia has produced in the last ten years. Some of the more substantial plans include five (5) EPA-approved ozone maintenance plans for areas previously designated as nonattainment under the ozone National Ambient Air Quality Standard (NAAQS); six (6) EPA-Approved fine particulate maintenance plans under the $PM_{2.5}$ NAAQS; a partially approved Regional Haze plan (the deficiency was outside of the state's control); and a fully approved Regional Haze Five-Year Progress Report SIP. Moreover, under my supervision, nine (9) West Virginia Legislative Rules were developed, adopted by the state and approved by EPA for incorporation into the West Virginia SIP. Finally, I supervised the development of four (4) attainment demonstrations for previous fine particulate nonattainment areas, which included highly technical photochemical atmospheric modeling.

2.     With my personal knowledge and experience, I understand the steps that DEP has taken and those it will need to undertake in response to the EPA's Section 111(d) Rule. Based on my experience, I have determined that implementing the Section 111(d) Rule will be an extremely complicated and time-consuming endeavor. It will be the most complicated CAA implementation effort

2

West Virginia has ever undertaken. The Section 111(d) Rule is unlike any other Clean Air Act implementation undertaken by West Virginia. Specifically, the Section 111(d) Rule's reliance on measures outside the affected facilities' boundaries (fence-line)—building blocks 2, and 3—are entirely unprecedented for any state. West Virginia will be required to expend an unprecedented amount of resources to design a State Plan that incorporates emission rate and/or emissions mass reductions related to these building blocks. It is also apparent that other state entities beyond DEP, including, but not necessarily limited to the West Virginia Division of Energy and Public Service Commission will expend significant resources as well. Because of the unprecedented reach of the 111(d) Rule into areas that neither the CAA nor its state law counterpart in West Virginia have ever been extended, authorizing legislation presenting many issues at the highest level of state policy will require the state Senate, the state House of Delegates and the office of the West Virginia Governor to expend significant resources in developing, and guiding the policy for implementation of the 111(d) Rule.

3.      Since the rule was proposed in June of 2014, at least five (5) DEP senior staff employees have expended 2,700 hours or more on understanding the Section 111(d) Rule and preparing for its implementation, including: reading the proposed rules and supporting documentation; drafting comments on the proposal; holding meetings with power plant owners/operators, the Division of Energy, the

P000011

Public Service Commission, and PJM, the Regional Transmission Organization that serves West Virginia; and, participating in numerous webinars and conference calls in an effort to understand the options available to the state in order to comply with the rule as proposed.

4. Several constraints combine to force the DEP to put a great deal of its resources into the work of developing a state plan immediately. As suggested above, adoption of legislation authorizing the DEP to expand the scope of its regulatory jurisdiction will be required. After that is accomplished, compliance with legislative rulemaking requirements for adoption of implementing regulations requires nearly a year, beginning in May and extending through legislative approval of rules in March of the following year. Drafting the necessary legislation and rules will be a time consuming endeavor. The State Plan DEP must develop is subject to Legislative approval and the constraints contained in the West Virginia Code. Furthermore, EPA's deadlines in the 111(d) Rule make it nearly impossible for DEP to design a State Plan in time to comply.

5. The stringency of the 111(d) Rule's interim goals exacerbates the pressure on the DEP to immediately dedicate a great deal of resources into development of a State Plan. To comply with the interim goals that purportedly provide a "glidepath" from 2022 to the final goals in 2030, affected power producers must begin their efforts well before the interim goals take effect in 2022.

4

Any delay in expending resources to develop and submit a state plan to EPA will shorten the amount of time power producers will have to begin their compliance efforts, making them less likely to be able to comply. After a Plan is submitted to EPA, whatever additional time is lost in EPA's approval process will further shorten the time power producers have to try to comply with the interim requirements and make them even less likely to be able to comply with them. Days lost in DEP's development and submission of a State Plan and in EPA's approval of it are days the power industry will not have to devote to compliance efforts.

6. Planning and compliance for the Section 111(d) Rule, including designing a State Plan, will require an unprecedented amount of resources, the expenditure of which has already begun. The Section 111(d) Rule gives West Virginia until September 6, 2016 to submit its initial State Plan. Extensions are available for up to two years for submittal of a final plan. In practice, a state has only one year to make the critical decisions that will dramatically affect its citizens and economy for decades to come, requiring careful consideration of all available approaches. EPA has illustrated at least six basic approaches that a state may adopt. Submission of a plan will require the state to consider these and other approaches and choose an approach within little more than a year, so that a timely plan submittal can be made. In addition to describing the approach the initial plan must also: identify

5

P000013

how it applies to affected EGUs; demonstrate that the plan will meet the applicable rate or mass state goal; define monitoring, reporting and recordkeeping requirements for affected EGUs; specify state recordkeeping and reporting requirements; document public participation and public hearing and include any pertinent documentation. Preparing and submitting a timely plan requires several dedicated DEP staff members, as well as significant resources from other state agencies, stakeholders, and the legislature. Activities include: reviewing the final rule to determine whether the data and underlying assumptions used in calculating the goal are correct; educating the regulated entities and other stakeholders regarding provisions of the final rule; coordinating with the PSC and DOE regarding renewable energy standards, demand side management programs and other issues; evaluating different compliance strategies that could be implemented to meet the interim and final goals; determining the statutory and regulatory changes needed for each of the strategies; and taking initial steps to develop support across all stakeholders and policy makers for potential compliance strategies. Concurrently, the DEP will need to review and comment on EPA's proposed "backstop" Federal Plan (FP) to evaluate the consequences if the state is unable to submit an approvable plan in a timely manner. I estimate that DEP will need to engage nine (9) senior staff employees, providing 7,100 hours of effort or more to address these tasks.

6

7. EPA has recently issued two "SIP Calls" to West Virginia to correct deficiencies in the extant SIP: *Findings of Failure To Submit a Section 110 State Implementation Plan for Interstate Transport for the 2008 National Ambient Air Quality Standards for Ozone* and *State Implementation Plans: Response to Petition for Rulemaking,* 80 Fed.Reg. 39961 (July 13, 2015), and *State Implementation Plans: Response to Petition for Rulemaking; Restatement and Update of EPA's SSM Policy Applicable to SIPs; Findings of Substantial Inadequacy; and SIP Calls To Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown and Malfunction; Final Rule*, 80 Fed.Reg. 33840 (June 12, 2015). Moreover the state has outstanding obligations to address two nonattainment areas under the sulfur dioxide standard. The enormous resource drain caused by attempting to understand the requirements of a final rule and develop an approvable 111d plan will severely impact the DEP's ability to fulfill these and other obligations under the CAA.

8. Implementation of the Section 111(d) Rule will require statutory and regulatory changes, all requiring considerable staff time. The Section 111(d) Rule requires a sweeping change to the DEP's authority.  In addition to submitting a compliance plan for EPA approval, DEP must have the ability to enforce each portion of the state plan, many elements of which are beyond DEP's current authority.  In order to have the ability to enforce components of the plan, such as

7

energy efficiency and redispatch of electricity on the grid, the West Virginia legislature will have to re-write state law. Consultation to ensure that authorities are clearly delineated among agencies will include additional meetings with PSC and DOE staff, owners/operators of power production and PJM.

9.  Importantly, the required changes in West Virginia's law will need to be undone if the Section 111(d) Rule is invalidated.

10. The aforementioned reasons demonstrate that a stay of the final Section 111(d) rule is clearly warranted.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this _10th_ of _August 2015_, at Charleston, West Virginia.


WILLIAM F. DURHAM



8

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE:  STATE OF WEST VIRGINIA, et al.,

**PETITIONERS,**

Case No. 15-_____

---

**DECLARATION OF THOMAS W. EASTERLY,
COMMISSIONER, INDIANA DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT**

---

I, Thomas W. Easterly, declare as follows:

1.      I am the Commissioner of the Indiana Department of Environmental Management (IDEM).  I have been the Commissioner of IDEM for over ten years.  As the Commissioner, I have personal knowledge and experience to understand what steps IDEM has taken and will need to undertake in response to the Environmental Protection Agency's *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units*, published on the EPA website on August 3, 2015 (Section 111(d) Rule). EPA-HQ-OAR-2013-0602, available at http://www.epa.gov/airquality/cpp/cpp-final-rule.pdf. The final Section 111(d) Rule sets a deadline of September 6, 2016 for submitting initial plans, with

the final deadline for a complete plan, with all legislative authority required to implement the plan, in place by September 6, 2018.

2.    IDEM has determined that implementing the Section 111(d) Rule will be a complex and time-consuming endeavor. Specifically, creating a plan under the Section 111(d) Rule is complicated by the Rule's unprecedented reliance on outside-the-fence control measures, including increased utilization of renewable energy. IDEM has determined it cannot meet the reduction goals set by the Section 111(d) Rule solely through the implementation of heat rate improvements, and thus will be forced to implement unorthodox outside-the-fence control measures in order to have its plan approved. Such measures will require a coordination effort across multiple state agencies, including the Indiana Utility Regulatory Commission (IURC) and the Indiana Utility Forecasting Group (IUFG). Currently, neither IDEM nor any other Indiana state agency has the authority to implement outside-the-fence controls in the measurable and enforceable fashion required by the Clean Air Act. Therefore, in order to comply with the Rule, the State would have to take legislative action to ensure the appropriate state agencies have the authority needed to create and implement any state plan.

3.    Indiana's power supply is also governed by more than one Regional Transmission Organization (RTO), requiring coordination with both the Midcontinent Independent System Operator (MISO) and the Pennsylvania Jersey

2

Maryland Power Pool (PJM), in attempting to find ways to implement the outside-the-fence building block. The coordination among state agencies and RTOs, as well as the legislative changes required to implement the Rule, make creating a state plan extremely difficult, especially in the limited timeframe contemplated by the Section 111(d) Rule.

4.    As a practical matter, in light of the September 6, 2016 and September 6, 2018 deadlines, the State cannot wait until the litigation challenging the Rule is concluded to begin evaluating the Section 111(d) Rule and expending substantial resources to create a state plan.  The State has already expended resources and expects to take further steps in the coming years as a direct result of the Section 111(d) Rule.  This expenditure of resources will likely include coordinating among state agencies and RTOs, seeking input of interested stakeholders, participating in external modeling and cost analyses, and possibly requesting legislative changes to give IDEM or another state agency the authority needed to implement the outside-the-fence building block required by the Rule.  Without a stay of the final rule, IDEM cannot wait until litigation is concluded before expending significant time and resources on formulating a state plan and seeking regulatory and legislative authority to implement the plan. However, even if Indiana begins its work immediately, it is unlikely that it can meet the timeframes for reductions set by the Section 111(d) Rule.  The deadline for Indiana state agencies to propose legislative

3

changes to be considered during the 2016 Indiana Legislative Session has passed, so any legislative changes made in response to the 111(d) Rule will not take effect until at least July of 2017. Indiana's statutory rulemaking process then takes at least eighteen months to complete, meaning Indiana will likely not have an approvable plan in place prior to the final September 6, 2018 deadline. From a resource perspective, the Section 111(d) Rule also detracts from efforts to implement other requirements of the Clean Air Act, and provides no additional revenue or resources to the State.

5.    Significant changes have been made in the final Section 111(d) Rule from the version that EPA published for public comment on June 18, 2014. 79 Fed. Reg. 34,830.  These changes have negated much of the work IDEM has already performed in trying to formulate a plan based on the draft language, and will now require significant analytical work to formulate an approvable plan in the short timeframe set by the September 6, 2016 deadline. Specifically, the final rule includes a substantial increase in the reductions required by Indiana sources. For example, the proposed rule set a emissions rate of 1,531 $CO_2$ lbs/Net MWh to be achieved by 2030, while the final rule sets a 2030 rate of 1,242 $CO_2$ lbs/Net MWh. IDEM has already spent time and resources trying to formulate a plan that would achieve the reductions in the proposed rule; Indiana must now perform new calculations and analysis, and has barely a year to perform this work.

4

6.    Another change in the final Section 111(d) Rule is the option to implement an emissions trading program as part of a state plan. Inclusion of a trading program would require significant coordination with other states to ensure enough credits are available for exchange through approved trade-ready plans. Again, this coordination will be difficult, if not impossible, to perform before the September 6, 2016 deadline. Additionally, on the same day that it published the Section 111(d) Rule on its website, EPA issued a proposed rule, *Federal Plan Requirements for Greenhouse Gas Emissions form Electric Generating Units Constructed on or Before January 8, 2014; Model Trading Rules; Amendments to Framework Regulation.* EPA-HQ-OAR-2015-0119, available at http://www.epa.gov/airquality/cpp/cpp-proposed-federal-plan.pdf. *Inter alia,* the draft rule purports to offer implementation guidance on trade-ready programs. However, the proposed rule is not final yet, and therefore Indiana and other states cannot rely on its guidance in attempting to develop an approvable state plan that includes emissions trading. It is possible the rule providing guidance on trading programs will not be finalized until after the Section 111(d) Rule's September 6, 2016 deadline for submitting plan proposals, further supporting the need for a stay of the Rule's deadlines.

5

P000021

7.     The proposed rule mentioned above also includes a draft federal plan for states that are not able, or choose not to, have a state plan approved by EPA. As stated earlier, the draft rule may not be finalized before the September 6, 2016 deadline for submitting plan proposals. Without a stay of the submittal deadlines in the Section 111(d) Rule, Indiana and other states will be forced to make decisions about whether to attempt to formulate a state plan, or choose to be subject to a federal plan, with incomplete information on what the federal plan would entail.

8.     In addition, it is uncertain whether any state plan will be approved by EPA in time for utilities to comply with the Section 111(d) Rule's interim goals. As stated above, the reductions required of Indiana sources in the final rule are significantly greater than the proposed rule, largely because the reliance on zero-emitting renewables increased by threefold. The reductions in the final rule are based on a regional flat rate of 20.5% zero-emitting renewables (RE), or more than 22 million MWh. While the final rule does not mandate that RE be utilized to achieve the required reductions, it is highly unlikely that Indiana will be able to develop an approvable plan that does not rely on a considerable growth in zero-emitting renewable energy. Based on the complexities, required coordination and consultation, it would take Indiana all if not more of the three full years to devise a plan, and, based on my experience as Commissioner, EPA is likely to take at least 2 years to act on it.  Therefore, at best, an enforceable plan would not be in place

P000022

until mid-2020. Utilities, the state utility regulatory agencies, and the RTOs would likely not take action on measures within a state plan until it is federally approved and enforceable. In order for Indiana and its EGU fleet to comply with the rule's 2022 interim goal, all measures would need to be in place by January 1, 2022. Once the state plan is approved, the utilities would have less than two years to secure utility commission approval of cost for infrastructure improvements necessary to achieve the goal and institute the changes needed. For renewables, time is required to secure capital equipment financing, add the infrastructure necessary to get the energy from the equipment to the grid, acquire property and transmission line right-of-way, and finally construct the equipment and required transmission. For both fossil fuel and renewable projects in Indiana over the course of the past 10 years, a minimum of 5-10 years has been required from utility commission approval to when energy is delivered to the grid. Achievement of the Section 111(d) Rule's interim goals is therefore practically infeasible.

P000023

9.    Undertaking the required measures will seriously disrupt the State's sovereign priorities, which would otherwise be devoted to addressing other pressing issues of public concern.    Importantly, the above-described measures would also involve changes in Indiana regulations and statutes, which will then need to be undone if the Section 111(d) Rule is invalidated.    Again, this would seriously disrupt the State's ability to achieve its own sovereign priorities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this _12TH_ day of August in Indianapolis, Indiana.

Thomas W. Easterly, Commissioner
Indiana Department of Environmental Management

8

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

Petitioners.

Case No. 15-_____

## DECLARATION OF RONALD W. GORE

I, Ronald W. Gore, hereby declare as follows:

1.   I am the Chief of the Air Division within the Alabama Department of Environmental Management (ADEM). I have been employed by ADEM for 41 years. As part of my duties, I am responsible for the Division's development of State plans to implement federal air quality rules and regulations.

2.   Based on my position, I have the personal knowledge and experience to understand what steps the State will need to undertake in response to EPA's finalized *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units*, 79

P000025

Fed. Reg. 34,830 (June 18, 2014) ("Section 111(d) Rule" or "Rule"). This includes personal knowledge and experience in preparing a State plan consistent with the Rule. Under that Rule, the State must submit a plan to the Environmental Protection Agency ("EPA") by late summer of 2016, absent special circumstances.

3. Based on my knowledge and experience, I believe that developing Alabama's response to the Section 111(d) Rule will be the most complex air pollution rulemaking undertaken by ADEM in the last 41 years. I have been responsible for and worked on many State plans designed to be submitted to and approved by EPA, including plans for attaining air quality standards, construction and operating permit plans, visibility rules, etc. The Clean Air Act recognizes the time and resources necessary to draft and finalize such plans by providing three to five years, at a minimum, for States to submit them. In the 111(d) Rule, EPA requires that States submit a vastly more complex rule in one to three years.

4. EPA has proposed that GHG reductions can be maximized by viewing the electric utility system in a very broad way, i.e., that States can and should regulate facilities and consumer behavior in ways never before considered to be authorized by the CAA. This broadening of authority means that ADEM will likely have to seek authorization from the State Legislature to implement EPA's proposal. It is likely that other Alabama agencies will need to participate in enforcing parts of Alabama's plan and broad new State Legislative authority will be needed for them as well. ADEM historically has been the agency solely responsible for air quality compliance in the State. Having several other State agencies closely involved in the development and administration of air quality rules presents a daunting challenge for ADEM.

2

5.  Since EPA proposed the Section 111(d) Rule in June of 2014, ADEM has expended considerable resources in attempting to understand the State's necessary response. Two employees have been assigned full-time to analyzing the proposal. I estimate that in addition to the two full time employees mentioned above, an additional three man years[1] of effort are being expended by fifteen other employees who devote part of their work time on 111(d) issues. In total, I estimate that five man-years of effort, (equating to approximately $475,000 in additional personnel costs per year) are being deployed at present responding to the Section 111(d) Rule. Efforts on which resources have been spent include, but are not limited to, the following examples:

- Checking EPA's calculations and assumptions on the emissions reduction goals the State should attain

- Generating possible responses to check whether they are achievable in practice

- Meeting with trade groups, EPA, other states, environmental groups, individual utilities, etc. to consider their input and viewpoints

- Traveling to and speaking at EPA's Regional Public Hearing

- Traveling to and participating in several national workshops on Section 111(d)

- Holding many internal meetings to facilitate information flow up and down the management chain

6.  Now that the Section 111(d) Rule has been finalized and adopted, additional man-years of effort will be needed for ADEM to prepare and submit a plan. Assuming ADEM chooses to prepare and submit a plan, my best estimate is that eight man-years of effort (equating to $760,000 per year for several years) would be needed.

---

[1] The approximate dollar value of a "man year" is estimated to be $95,000, counting salary, fringe benefits, and overhead.

3

7.  Should the Court rule that EPA has overstepped its authority, ADEM's efforts would cease.

I declare under penalty of perjury that the foregoing is correct.

Executed on this  6th  day of August 2015, in Montgomery, Alabama.

Ronald W. Gore

4

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

Petitioners.

Case No. 15-_____

## DECLARATION OF THOMAS GROSS

I, Thomas Gross, hereby declare as follows:

1.     I am the Chief of the Monitoring and Planning Section in the Kansas Department of Health and Environment Bureau of Air Quality. I have been employed by the Kansas Department of Health and Environment for 39 years. As part of my duties, I am responsible for managing the group that develops state plans to implement federal air quality rules and regulations.

2.     Based on my position, I have the personal knowledge and experience to understand what steps the State will need to undertake in response to EPA's Section 111(d) Rule, including the preparation of a state plan consistent with the Rule.

P000029

3.    Based on my work, I have determined that implementing the Section 111(d) Rule presents a complicated endeavor, including the creation of the state plan. Based on my experience in working in other state plans and state implementation plans (SIPs) such as mercury, regional haze, ozone and lead, the Section 111(d) plan will likely take from three to five years, with the longer time frame being required if a multi-state plan is prepared.

4.    Creating a plan of the type envisioned under Section 111(d) is a complicated endeavor for several reasons. First is the large potential for stranded investments in the State of Kansas. Kansas is in a unique situation due to the proportion of coal-fired units subject to the BART requirements of the regional haze program. The six largest coal-fired units in Kansas made significant investments in criteria pollutant emission reduction equipment in the last three to four years to comply with EPA's regional haze program. More than $3 billion has been earmarked for these projects that have recently been completed. The financing for these improvements to control criteria pollutants will not mature by the time the Clean Power Plan interim deadlines will require closure of some of these plants to meet the state goal. These plants are operating at control efficiencies that are very near to new BACT rates for new facilities. Although not new, the investments made in pollution control equipment are significant and should be allowed to be amortized over a greater time period than allowed under the Rule.

5.    The Rule uses three building blocks to develop the $CO_2$ emissions goals for each state. Building block number one, regarding heat rate improvements, sets a goal that is not achievable across the entire fleet of affected units in Kansas. A major impediment to the type of boiler upgrade projects that could achieve significant heat rate improvements is the fact that they would likely trigger a Best Available Control Technology (BACT) review as part of a Prevention of Significant Deterioration (PSD) permit process. If a plant were not yet equipped with a SCR

2

P000030

unit to control $NO_x$, a heat rate improvement project that might cost $5 million could turn into an SCR project for $NO_x$ reductions with a price tag of $100 million as a result of a BACT review conducted as part of a PSD permit review process. Smaller scale heat rate improvement projects that would not trigger a BACT review will not be able to achieve the 4.3% goal contained in this building block.

       The third building block requires affected units to achieve $CO_2$ emissions reductions off the footprint of the affected unit. In Kansas, this building block has the greatest potential for $CO_2$ emission reductions. Building block number three sets a goal for renewable energy generation based on the potential for wind development in Kansas. There are a limited number of viable sites for wind energy development in Kansas. The number is limited by (1) the listing of the lesser prairie chicken as a threatened species under the Endangered Species act; (2) state policy of protection of Flint Hills ecosystem; and (3) lack of adequate transmission lines or transmission bottlenecks. Kansas utilities will have to compete with neighboring states contracting with merchant wind developers for these limited sites.

Additionally, the renewable energy statutory mandate was changed to a goal during the 2015 legislative session. While Kansas utilities currently meet the requirements of the revoked standard and were on a path to meet the 2020 goal, the shortfalls in meeting the goals established in building block one would have to be made up in building block three. There is a large potential for wind energy development in western Kansas when upgraded transmission lines to out-of-state markets are completed. However, the final Rule does not grant any emission reduction credits to Kansas utilities for the zero emissions wind energy produced in Kansas that is sold out-of-state. In the Rule the renewable energy credits follow the electricity to the out-of-state utility with the power purchase agreement.

3

To capture credit for the renewable energy sold to out-of-state markets, Kansas will have to participate in some form of interstate program that would include states receiving Kansas wind energy. Such a program would require new statutory authority, significant groundwork in determining which states would participate, resources to develop interstate agreements to create the entity that would administer the trading program, and time to create parallel regulations in each state to implement a program that would allow for Kansas to receive benefit from the zero carbon emissions associated with future wind energy development.

6.     While the deadline in the final rule for submission of a final state plan has been extended, the timeframe allowed is still substantially shorter than the time period required to develop the state regional haze plans for EPA's Regional Haze Rule. Therefore, the State could not wait until the Rule was finalized to begin evaluating the Section 111(d) Rule and has therefore expended substantial resources to create a State 111(d) Plan. This expenditure of resources has included significant staff time to date and has expanded significantly as we are moving forward in reviewing the final rule to determine its implications for Kansas. Our activities include evaluating the data and underlying assumptions used in calculating the goal to ensure they are correct; educating the regulated entities and other stakeholders regarding provisions of the final Rule; coordinating with the Kansas Corporation Commission ("KCC") regarding modeling alternate dispatch scenarios to comply with the Rule; evaluating the change in Kansas law regarding implementing renewable energy standards and its impact on complying with the Rule; evaluating different compliance strategies that could be implemented to meet the goal in the final Rule; determining what statutory and regulatory changes will be needed for each of the strategies; and taking initial steps to develop support across all stakeholders and policy makers for potential compliance strategies. With the limitations described above regarding

4

building block number one, implementation of a plan with sufficient renewable energy to meet the goal and offset the harm associated with stranded investments will require significant policy shifts by the Kansas legislature and other policymakers.

7.    The State will expend significant resources as a direct result of the Section 111(d) Rule. This includes time to read, absorb, and interpret the several thousand pages of white papers, program design documents, preamble, rule and technical support documents, as well as to attend meetings and conference calls with stakeholders, elected officials and the KCC. The State expects to take further steps in the coming months as a direct result of the Section 111(d) Rule. Kansas will likely need statutory and regulatory changes, all requiring considerable staff time. Consultation meetings will include additional meetings with the KCC staff, the Southwest Power Pool, the Kansas Municipal Utilities, and the Kansas Power Pool. KDHE staff will present legislative briefings once the Kansas Legislature is in session. A considerable amount of staff effort will be needed to educate stakeholders and develop a plan. KDHE expects to spend the equivalent of at least four full-time employee positions per year amongst the six to eight staff and managers who are involved in implementing the final Rule (including proposing a state plan) for the next several years.

8.    If a stay is entered by this Court, Kansas will halt the above-described expenditures.

9.    Absent a stay from this Court, it is not practical for Kansas to wait to continue work on its State 111(d) Plan. It is already doubtful that Kansas can design a Plan in time to comply with EPA's deadlines. Waiting until litigation concludes will make compliance with EPA's deadlines impossible. And any delay in designing a State Plan will risk Kansas's ability

5

P000033

to comply with EPA's deadlines. The timeframes available to states are insufficient to allow compliance with the Rule.

10.     Absent a stay from this Court, if Kansas chooses to adopt a multi-state approach to complying with the Section 111(d) Rule, Kansas may need to enter into either a memorandum of understanding or agreement with the other states. Kansas has limited experience in pursuing this type of agreement with other states, and anticipates that a significant amount of time would be required to negotiate and reach consensus on the content of such an agreement with other state agencies.

11.     Absent a stay from this Court, implementation of the Section 111(d) Rule will require legislative changes, which will require the substantial expenditure of State resources that must be spent in the next year, and consideration of which must begin immediately. Undertaking these measures will seriously disrupt the State's sovereign priorities, which would otherwise be devoted to addressing other pressing issues of public concern.

I declare under penalty of perjury that the foregoing is correct. Executed on this ____ day of _____, 2015, at Topeka, Kansas.

Thomas Gross

6

P000034

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

Petitioners.

Case No. 15-_____

---

## DECLARATION OF ROBERT HODANBOSI, CHIEF, DIVISION OF AIR POLLUTION CONTROL, OHIO ENVIRONMENTAL PROTECTION AGENCY

---

I, Robert Hodanbosi, declare as follows:

1.      I am the Chief of the Division of Air Pollution Control at the Ohio Environmental Protection Agency ("Ohio EPA"). I have served as Chief of the Division for over 22 years and have been a member of the Division of Air Pollution Control at Ohio EPA for over 40 years. As part of my duties, I am responsible for all aspects of Ohio's air pollution control program—compliance

monitoring, permit issuance, regulatory enforcement, and administering for Ohio the delegated aspects of the federal program under the Clean Air Act, as well as Ohio's own air pollution control laws and rules. Among my duties are attainment/nonattainment planning, SIP calls, state implementation plan development, regulation development, and other matters as necessary. In this capacity, I am familiar with Ohio's electric generating units, their generating capacity, and the regulatory and related issues they face, as well as other industrial and commercial sources of air pollution. It will be my and my staff's responsibility to undertake and implement Ohio's response to the U.S. EPA's Section 111(d) Rule.

2.    Based on my experience, I have determined that implementing the Section 111(d) Rule will be a complicated and time-consuming endeavor. The Section 111(d) Rule is unlike any other Clean Air Act implementation undertaken by Ohio. Among other things, the Section 111(d) Rule's reliance on measures that require the reduction of demand for a particular source of energy—the substitution of certain types of energy for others in building blocks 2 and 3—are entirely unprecedented for Ohio. The State would be required to expend an unprecedentedly large number of resources to design a State Plan that incorporates these building blocks. The burden on the State in doing so is further aggravated by the substantial changes between the proposed and final rules. The State's

2

resources would have to be diverted from work on the State's other air pollution activities. See Appendix A.

3.    Already, various employees have expended approximately 3000 hours seeking to understand the Section 111(d) Rule and preparing for its potential implementation.   This has included reviewing the proposed and final rules, attending webinars held by U.S. EPA, and participating in stakeholder meetings, among other endeavors.

4.    Given the complexity of the issues involved and the comprehensive nature of the unprecedented regulatory program, it would not be practical for Ohio to postpone work on a State Plan absent a stay from this Court.   It is not proper to expect that Ohio can design an effective interim State Plan in time to comply with U.S. EPA's deadline, which is now September 2016.   Waiting to attempt implementation until after the litigation concludes while still complying with U.S. EPA's 2016 deadline would not be feasible.

5.    In addition, it is uncertain whether any State Plan will be approved by U.S. EPA and implemented in time for regulated parties to comply with the Section 111(d) Rule's interim goals, making any delay in expending resources impractical.  Waiting until litigation on this unprecedented rulemaking is complete to begin work on a State Plan would make it impossible for Ohio to meet the Section 111(d) Rule's interim compliance goals and U.S. EPA's deadline.  Ohio

3

must now determine and evaluate the mechanisms needed to comply with the rule. This will include an evaluation of any necessary legislative changes to the Ohio Revised Code. It also remains uncertain whether Ohio EPA or any other state agency has authority or jurisdiction to demand an out-of-state entity such as PJM (the electric grid manager for Ohio) to modify their current practice of determining which plants to operate and supply power to the grid that supplies electricity for Ohio citizens and businesses.

6.    Absent a stay from this Court, planning and compliance for the Section 111(d) Rule, including designing a State Plan, would require an enormous ongoing amount of human resources. Preparing and submitting a timely plan would require various dedicated Ohio EPA staff members, as well as significant resources from other state agencies, stakeholders, and potentially the legislature. As the new 40 C.F.R. § 60.5760 and 40 C.F.R § 60.5765 make clear, any possible extension from the September 6, 2016, deadline would require Ohio to provide a submittal that identifies and describes the final plan approach under consideration and the opportunity that Ohio provided for comment from relevant stakeholders on this approach.

7.    Absent a stay from this Court, if Ohio endeavors to adopt a multi-state approach to comply with the Section 111(d) Rule, Ohio would need to enter into either a memorandum of understanding or agreement with the other states. Ohio

4

P000038

has limited experience in pursuing this type of agreement with other states under the Clean Air Act, and anticipates that a significant amount of time would be required to negotiate and reach consensus on the content of such an agreement with other state agencies such that the final agreement meets U.S. EPA approval.

8.     Absent a stay from this Court, implementation of the Section 111(d) Rule could require legislative changes, which are uncertain and would require the substantial expenditure of Ohio resources that must be spent in the next year. Consideration of which legislative changes might be necessary must begin immediately.  The Section 111(d) Rule could require a sweeping change to the Ohio EPA's authority beyond any other previous requirements under the Clean Air Act.

P000039

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on *August 11, 2015*          *Robert Hendanbox*

6

**Appendix A**
**Upcoming Clean Air Act State Implementation Plan Activities**

1. Sulfur dioxide Consent Decree designations for certain unclassifiable area sources.
   a. Required under March 2, 2015 Northern district of California, enforceable agreement order between EPA and Sierra Club/NRDC.
   b. In a May 20, 2015 letter to the Governor, U.S. EPA provided a schedule for completing designations for these areas around these sources. The letter provides it as an option for States to submit recommendations, but CAA Section 107(d)(1)(A) requires governors to submit initial designations. Ohio has yet to submit designations for these areas.
   c. State recommendations are due September 18, 2015.

2. Remaining sulfur dioxide unclassifiable area source designations.
   a. Required under 79 FR 27446 – Proposed Data Requirements Rule and May 20, 2015 Memo (Stephen Page to Regional Air Division Directors, "Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standards").
   b. Schedule and process for designating unclassifiable areas.
      i. January 1, 2016: provide lists of sources to be modeled or monitored.
      ii. July 1, 2016: Submit monitoring plan for monitored sources.
      iii. January 1, 2017: Begin operation of monitors.
      iv. January 13, 2017: Submit modeling analysis and recommended designations for modeled sources.
      v. December 2017: USEPA will finalize designations with additional input from States during the 120-day letter notification.
      vi. August 2019: Attainment demonstrations due for modeled areas.
      vii. Mid 2020: Designations for monitored areas. States will be required to provide recommendations prior to this.
      viii. August 2022: Attainment demonstrations due for monitored areas.

3. Completion of sulfur dioxide attainment demonstration and revisions to federally enforceable regulations.
   a. Due April 4, 2015 but was delayed due to significant resource allocation during Clean Power Plan proposal. Submittal by October 4, 2015 necessary or Ohio's submittal can be found incomplete and a Federal Implementation Plan clock can be initiated.

4. Particulate Matter (PM2.5) infrastructure SIP for the 2012 PM2.5 standard.
   a. Required under CAA Section 110(a)(1)
   b. Due December 13, 2015

5. PM2.5 attainment demonstration for the 2012 PM2.5 standard.
   a. Required under CAA Section 110(a)(1) and Section 189.
   b. Due October 15, 2016

6. Redesignation and maintenance plans for two areas under the 2008 ozone standard
   a. Requirements contained in CAA Section 107(d)(3)(E)
   b. Areas should be redesignations as soon as practicable after attaining the standard. These areas attained at the end of 2014. Typically takes 6-9 months to prepare a redesignation request for submittal that fulfills the CAA requirements.

7. Redesignation and maintenance plan or extension request for one remaining area under the 2008 ozone standard.
   a. If this area attains at the end of the 2015 calendar year, a redesignation request will need prepared (see item 6 above), or if the area qualifies, an additional extension request will need prepared. If the area does not qualify, more extensive attainment planning may be necessitated.

8. Redesignation and maintenance plans for two areas under the 2008 lead standard.
   a. Requirements contained in CAA Section 107(d)(3)(E)
   b. Areas should be redesignations as soon as practicable after attaining the standard. These areas attained at the end of 2014. Typically takes 6-9 months to prepare a redesignation request for submittal that fulfills the CAA requirements.

9. 2015 ozone standard.
   a. Designations required under CAA Section 107(d)(1)(A) and attainment plans required under Section 110(a)(1) and Section 182.
   b. Projected to be finalized in October 2015. State recommendations on nonattainment will be due within 1 year. Designations complete within the following year. And state attainment plans would be due within 2 years of designations.

10. Transport SIPs for 2008 ozone standard.
    a. Required under CAA Section 110(a)(1) and Section 110(a)(2).
    b. Notice of Data Availability signed on July 23, 2015. States must submit comments by September 23, 2015.
    c. Transport SIP requirements expected to be proposed in 2015. States will need to prepare comments on the proposal and then be required to prepare SIPs to address requirements in this rule once final.

11. Appendix W comments.

a. On July 14, 2015, the Administrator signed a proposal to revise the *Guideline on Air Quality Models*. (Appendix W)
b. States must submit comments by October 27, 2015.

12. Corrections to older 2008 infrastructure SIPs.
    a. Infrastructure SIPs are required under CAA Section 110(a)(1). On May 15, 2015, EPA entered into a consent decree with Sierra Club requiring certain elements of these SIPs be addressed by March 31 and August 31, 2015 and also June 7, 2016. States must prepare submittals to address these elements and provide those to USEPA in time for them to act on these submittals by the consent decree deadlines.

13. Regional Haze 5-year review analysis.
    a. Required under CAA Section 169 and the Regional Haze Rule (64 FRCAA Section 169 and the Regional Haze Rule (64 FR 35714).
    b. Due by March 11, 2016.

14. NOx SIP Call/CAIR non-EGU/CSAPR Corrections.
    a. U.S. EPA's new Cross State Air Pollution Rule (CSAPR) applied to different sources than were covered under both the NOx SIP Call requirements and the Clean Air Interstate Rule (CAIR). States are required to address this discrepancy since U.S. EPA no longer administers the programs that applied to the sources no longer covered under CSAPR.

15. Startup, Shutdown, and Malfunction SIP Call

    a. On June 12, 2015 (80 FR 33840), U.S. EPA issued a SIP Call that requires Ohio to revise rules on emissions from startup, shutdown, malfunction and scheduled maintenance
    b. Revised rules to U.S. EPA are due within 18 months.

16. Cincinnati Area PM2.5 RACT/RACM Study

    a. As a result of the recent U.S. Sixth Circuit Court of Appeals July 14, 2015 decision to stay the Cincinnati area redesignation of the 1997 PM2.5 standard, Ohio will need to prepare a study of Reasonable Available Control Technology/Reasonably Available Control Measures (RACT/RACM).

    b. The RACT/RACM study requires that Ohio EPA examine all major sources of PM2.5 and determine if the control of the sources are RACT/RACM. An additional redesignation request will have to be submitted with the RACT/RACM analysis.

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

IN RE STATE OF WEST VIRGINIA, et al.,

               Petitioners.

Case No. 15-_____

---

**DECLARATION OF JOHN S. LYONS,**
**KENTUCKY ENERGY AND ENVIRONMENT CABINET**

---

I, John S. Lyons, declare as follows:

1.        I am the Assistant Secretary for Climate Policy at the Kentucky Energy and Environment Cabinet ("EEC"). I have been employed by the EEC for nearly 27 years. As part of my duties I am solely responsible for overseeing the Cabinet's activities related to the Clean Power Plan. I have personal knowledge and experience to understand what steps that Kentucky has taken and will need to

undertake in response to the EPA's Section 111(d) Rule. My previous role as the Kentucky Division for Air Quality Director makes me qualified to ascertain the efforts the Cabinet will have to undertake to consider both environmental and energy related regulatory and policy matters associated with implementing this rule.

2.    Based on my experience, I have determined that implementing the Section 111(d) Rule will be a complicated and time-consuming endeavor. The Section 111(d) Rule is unlike any other Clean Air Act implementation undertaken by Kentucky. Specifically, this is the first time the Environmental Protection Agency has used Section 111(d) to require the reduction of $CO_2$ emissions from any industrial sector. Kentucky will be required to expend a large number of resources to design a State Plan that incorporates the rule's requirements.

3.    Over the past 19 months, my main duty has been to coordinate and plan responses to the proposed and final 111(d) rule. Other Cabinet staff from the Department for Environmental Protection and the Department for Energy Development and Independence has been involved on an "as needed" basis.

4.    Absent a stay from this Court, it is not practical for Kentucky to wait to continue work on its State Plan. Waiting until the litigation concludes will make compliance with EPA's deadlines impossible. And any delay in designing a State Plan will risk Kentucky's ability to comply with EPA's deadlines. The Section

2

111(d) Rule will give Kentucky until September 6, 2016, to submit its initial plan and an additional two years to finalize the plan by September 6, 2018.  Preparing and submitting a timely plan will require several staff members from the Cabinet's Division for Air Quality, Department for Energy Development and Independence, as well as consultation with the state's Public Service Commission. Importantly, the Cabinet will also spend significant time engaging with stakeholders and the Kentucky General Assembly in plan development.

5.    During consultation with the Kentucky Public Service Commission, it raised concerns about the effects of the Section 111(d) Rule on ratepayers; stranded costs ratepayers may incur as a result of closure of coal-fired generation plants which were retrofitted for compliance with prior EPA rules; and, any rulemaking that could affect Kentucky's vertically integrated regulatory scheme and the protections it provides to ratepayers.

6.    Absent a stay from this Court, implementation of the Section 111(d) Rule could require regulatory development, which will require the expenditure of Cabinet resources that must be spent in the next year, and consideration of which must begin immediately.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

3

John S. Lyons
Assistant Secretary for Climate Policy
Energy and Environment Cabinet

Executed on   8/5/15

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

        Petitioners.

Case No. 15-_____

## DECLARATION OF JIM MACY, DIRECTOR,
## NEBRASKA DEPARTMENT OF ENVIRONMENTAL QUALITY

I, Jim Macy, declare as follows:

    1.        I am the Director at the Nebraska Department of Environmental Quality ("NDEQ"). I have over 30 years of experience in the environmental field as a regulatory official in the State of Missouri, as a consultant, and now as the head of the State of Nebraska's environmental agency. As part of my duties, I am responsible for overseeing and supervising the agency in Nebraska with exclusive jurisdiction to act as the state air pollution control agency for all purposes of the Clean Air Act, as amended, 42 U.S.C. 7401 et seq., including development and

administration of State Plans under Section 111(d) of the Clean Air Act. I have personal knowledge and experience to understand what steps that Nebraska has taken and will need to undertake in response to the EPA's final Section 111(d) Rule: Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units.

2.    Based on my experience, I have determined that implementing the final Section 111(d) Rule will be a complicated and time-consuming endeavor. The final Section 111(d) Rule is unlike any other Clean Air Act implementation undertaken by Nebraska. Specifically, the final Section 111(d) Rule's reliance on measures that require the reduction of demand for a particular source of energy—building blocks 2 and 3—are unprecedented for Nebraska and the NDEQ. Nebraska will be required to expend a large number of resources to design a State Plan that incorporates these building blocks.

3.    NDEQ employees have already expended approximately 2000 hours on interpreting and preparing for the implementation of the final Section 111(d). During the proposal stage, the NDEQ reviewed the proposal, held multiple meetings with the affected utilities to understand potential impacts, met with the affected utilities in groups and individually, met with the Southwest Power Pool to understand how the proposed 111(d) rule would impact transmission, convened discussions with industry and other interest groups, met with the Nebraska Energy

2

P000049

Office, met with the Nebraska Power Review Board, participated in conference calls with EPA and other states to clarify understanding of the proposed rule, analyzed the proposal, and prepared comments.

4.     Planning, designing, and implementing a State Plan to comply with the final Section 111(d) Rule will require substantial state resources. The NDEQ will need to partner with the Nebraska Energy Office and the Nebraska Power Review Board to implement the final Rule. This partnership will be unprecedented in Nebraska. The final 111(d) Rule requires that a State Plan be developed in a manner that goes through a public comment and public hearing process, which we anticipate could take as long as six months. The final Section 111(d) Rule gives Nebraska until September 6, 2016, to submit its State Plan. An extension is available, under certain conditions, which would extend that date to September 6, 2018. Preparing and submitting a timely plan may require three dedicated staff members, additional contractors to facilitate meetings with stakeholders state-wide, and significant resources from other state agencies, stakeholders, and the Nebraska Legislature. There will inevitably be additional or redirected costs of implementation so it is difficult to estimate the total cost at this time.

5.     If Nebraska chooses to adopt a multi-state approach to complying with the final Section 111(d) Rule, Nebraska will need to enter into either a

P000050

memorandum of understanding or agreement with the other States. Nebraska has experience in negotiating this type of agreement with other States, and it is anticipated that a significant amount of time will be required to negotiate and reach consensus on the content of such an agreement with other States.

6.    The final 111(d) Rule may also require changes in Nebraska laws, which would require action by the Nebraska Legislature. The timetable for legislative changes is unknown.

7.    Implementing a State Plan under the final 111(d) Rule will consume vital state resources, which would otherwise be devoted to addressing pressing issues of public concern

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 6th, 2015.

Jim Macy, Director
Nebraska Department of
Environmental Quality

4

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

Petitioners.

Case No. 15-_____

## DECLARATION OF JEFF MCCLANAHAN

I, Jeff McClanahan, hereby declare as follows:

1        I am the Director of the Utilities Division of the Kansas Corporation Commission (KCC). The KCC regulates public utilities, common carriers, motor carriers, and oil and gas producers. Public utilities include local telephone, natural gas, and investor-owned electric service providers. As part of its duties, the KCC is responsible for ensuring that reliable and affordable energy is available and deliverable to Kansas citizens and businesses.

2.       Based on my position, I have the personal knowledge and experience to understand what steps the State will need to undertake in response to the Environmental Protection Agency's (EPA's) Section 111(d) Rule, including the difficulties that will be

P000052

encountered in attempting to comply with the Rule.    In general, the Section 111(d) Rule will dramatically transform the way electric power will be generated, dispatched, and transmitted to consumers in the State of Kansas and throughout the United States.

3.    Based on my work experience and position, I have determined that implementing the Section 111(d) Rule will be a complicated, time consuming, and expensive endeavor, which will require the expenditure of substantial State resources, immediately and over the next several years.

4.    Kansas will need at least three years to conclude a stakeholder process to determine the least cost state plan which ensures electric reliability.  This process will require:

a. Defining the options for compliance and evaluating these options in terms of least cost and reliability

b. The evaluation of these options will need to be done on an expanding geographical basis, beginning with the individual EGUs, then the individual utilities, next at a state level, and finally at a multi-state level.  At each stage, the options will need to be tested using sophisticated dispatch models with varying assumption about fuel costs, O&M costs, potential carbon prices, population and economic growth in Kansas and its surrounding states, different infrastructure developments including electric generation, transmission, and distribution investments, and natural gas infrastructure investment, to safeguard that only robust options are considered.  And finally, the options must be evaluated on both a Kansas only state plan and on a multi-state implementation plan.

c. The evaluation process will require the KCC to work with all the stakeholders to ensure that all of the feasible options are evaluated.  Thus, the process will require the KCC, utilities, the Kansas Department of Health and Environment (KDHE), the

Southwest Power Pool, and other affected groups to work together in a careful and efficient manner. This process will require expenditures on costly resources and entail several years of intensive study, consultation, and negotiation.

      d. Once the Commission, KDHE, and the State Legislature have agreed on a plan for its jurisdictional utilities, KDHE must develop a compliance plan or plans for each of the utilities.

      5.      Based on my knowledge and experience, the Section 111(d) Rule represents an unprecedented infringement by the EPA on the traditional authority of Kansas to manage energy resources within our jurisdiction because the mandates of the Section 111(d) require KCC to undertake specific changes to how energy is generated, dispatched, and transmitted to consumers. The Section 111(d) Rule also disrupts the well-settled division of authority over electricity markets under the Federal Power Act, and raises significant uncertainty about the role of the Federal Energy Regulatory Commission (FERC) to ensure the reliability of electricity through the wholesale market. In determining the adequacy and reliability of its system, a state must balance various public interest concerns and technical considerations to maintain sufficient and efficient service at just and reasonable rates. The overarching technical and policy concern in this area is the appropriate generation mix to be employed by jurisdictional utilities. The Section 111(d) Rule severely invades a state's authority to make such determinations.

      6.      Absent a stay from this Court, compliance planning must begin immediately. The system-wide changes necessary for compliance must be gradual to preserve reliability of the electric grid. Because compliance is calculated based on a moving average, the longer Kansas waits to begin compliance, the more expensive and difficult it will be to meet the requirements of the Rule. In addition, the KCC estimates it will spend approximately $500,000 to $1,000,000 on

consultants to aid in the analysis and development of a compliance plan. Any potential changes to EPA's Section 111(d) Rule resulting from court decisions, which will most likely take several years to decide, will require additional analysis and modification of the initial plan developed in Kansas. This will result in significant additional costs and a waste of the State's resources.

7.     Absent a stay from this Court, evaluation of specific compliance measures, such as new facilities or retirements, must also begin immediately. The lengthy application and approval process for utilities to construct, upgrade, or retire generation, transmission, and distribution facilities to comply with the Section 111(d) Rule, as well as the in-depth evaluation of public necessity and convenience for each facility, requires utilities to plan and submit applications for upgrades almost immediately after publication of the final Section 111(d) Rule in order to have equipment constructed, upgraded, or decommissioned before the compliance period begins in 2022.

8.     Absent a stay from this Court, Kansas will need to request an extension until 2018 in order to develop a reliable compliance plan at the lowest cost. EPA will then need six months to a year to approve the Kansas plan, resulting in a final approved plan in 2019. Given the three years (2019 to 2022) EPA is allowing for Kansas to construct or upgrade facilities with long construction times – five to seven years for transmission assets – the interim goals beginning in 2022 are unachievable. Further, the KCC expects billions in ratepayer costs to comply with this rule. Absent a stay from this court, Kansas utilities are at risk of spending this money to comply with a plan under pending review. If the rule is not upheld, ratepayers will be obligated to pay for those initial investments plus any investments made to comply with a modified rule. Immediate compliance has the potential to be a significant and unnecessary waste of state and ratepayer funds.

9.      In excess of $3 billion has been spent by Kansas utilities on environmental compliance projects for its coal-fired generation fleet, and these projects were approved by the EPA under state implementation plans (SIPs).   The Section 111(d) Rule creates stranded utility/ratepayer investment because coal-fired units that were retrofit in compliance with EPA rules have not been excluded from the calculations in determining a $CO_2$ emissions goal.  It is inherently unfair and extremely poor regulatory policy to require significant expenditures to reduce coal plant emissions and then change the regulatory paradigm to eliminate or significantly curtail coal-fired generation without regard to the useful remaining life of those Electric Generating Units (EGUs).

10.      Decisions made for the sake of compliance with the Section 111(d) Rule immediately and over the next several years will be irreversible and will impact the electric grid for decades.  System planning is typically based upon the 30-40 year expected lives of generation and transmission facilities.  The decision to prematurely retire an electric generating unit could significantly impact system reliability and may unnecessarily increase customer's rates for decades to come.

11.      The Section 111(d) Rule sets an emissions performance standard for the State of Kansas, rather than the specific affected EGUs.  By doing so, the EPA has created a near certainty that legally-troublesome cross-subsidies will occur between ratepayers of the various utilities in the state.  The KCC can address cross-subsidy issues within the context of setting rates for one single utility.  However, the EPA's state-wide emissions standard will create cross-subsidy issues between the customers of *separate utilities*.  The KCC does not have statutory authority to allocate the costs associated with the Rule to all ratepayers in Kansas because the KCC does not regulate a large number of utilities.  Therefore, if a non-jurisdictional utility does

not agree to a compliance plan, the KCC would be forced to require jurisdictional utilities to take additional measures to meet the overall emissions guideline. This results in KCC jurisdictional ratepayers subsidizing the costs of compliance for non-jurisdictional ratepayers.

12.    Absent a stay from this Court, if Kansas chooses to adopt a multi-state approach to comply with the Section 111(d) Rule, changes to rights and responsibilities of entities such as Regional Transmission Organizations ("RTOs") and Independent System Operators ("ISOs") will be immediate and long lasting. If Kansas joins in a multi-state compliance approach, it is likely to take the form of credit trading or an induced carbon price through the RTO. The members of these organizations must follow a prescribed stakeholder process to effect the changes, and Kansas must agree to grant certain enforcement powers to those organizations. The stakeholder process and any necessary institutional changes for the states included in the multi-state approach and the RTOs and ISO will need to be completed before a plan relying on those third parties can be submitted for approval to the EPA. Utilities require certainty of cost recovery when planning for large-scale infrastructure investments that have a useful life of 40 years or more. Adding institutional uncertainty to the already created increased price and investment uncertainty will make utility compliance even more problematic and could place affected utilities in an untenable position. These processes are lengthy, difficult to reverse once established, and will require immediate expenditure of resources over next calendar year.

I declare under penalty of perjury that the foregoing is correct. Executed on this _7ᵀᴴ_ day of _AUGUST_, at Topeka, Kansas.

Jeff McClanahan

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

              Petitioners.

Case No. 15-_____

## DECLARATION OF ELLEN NOWAK, CHAIR, WISCONSIN PUBLIC SERVICE COMMISSION

I, Ellen Nowak, declare as follows:

1. I am the Chair of the Public Service Commission of Wisconsin ("PSCW"). I have been employed at the PSCW for four years. As part of my

duties, I have authority to monitor, track, and interact with stakeholders[1] and regulators on the development and implementation of state and federal environmental rules impacting public utilities.

2. Immediately after the release of EPA's proposed *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Generating Units*, 79 Fed. Reg. 34, 830 (June 18, 2014) ("Proposed 111(d) Rule"), the PSCW acted to determine what steps Wisconsin would need to take in response. The PSCW's review determined that, in general, the Proposed 111(d) Rule would dramatically transform the way electric power would be generated and transmitted to consumers in Wisconsin and throughout the United States. The Proposed 111(d) Rule would, at the very least, require the construction of new power plants and associated infrastructure, the updating or decommissioning of existing power plants that are not fully depreciated, and the reduction in overall energy consumption by every single current and future consumer of electric power. In short, the Proposed 111(d) Rule would transform the American economy.

3. Based on my work experience and position, I have determined that implementing the Proposed 111(d) Rule would be a complicated, time consuming, and expensive endeavor, which would require the expenditure of substantial State

---

[1] Stakeholders include regulated utilities, merchant-owned EGUs, municipal utilities, utility cooperatives, environmental groups, industry groups, residential and small business representatives, Midcontinent Independent System Operator, Inc. ("MISO"), Midwest Renewable Energy Tracking System ("M-RETS"), and representatives from other entities interested in or impacted by state and federal environmental rules impacting public utilities.

- 2 -

resources, immediately and over the next calendar year.   On August 4, 2015 final version of the Proposed 111(d) Rule ("Final Rule"), was released.   Though the Final Rule is different than the proposal, it will not reduce the amount of resources necessary for planning and implementation in the immediate future.

4. Significant PSCW resources have already been invested to understand and evaluate the Proposed 111(d) Rule.  PSCW employees have spent significant time  understanding the proposal and preparing for implementation, including outreach to all Wisconsin stakeholders, organizing stakeholder meetings and listening sessions, participating in regional collaboratives such as Midcontinent States Environmental and Energy Regulators and the Midwest Power Sector Collaborative with other states and industry participants, attending EPA listening sessions and conference calls, and in-depth analysis of the impact of the 111(d) Rule on the state and regional systems.

5. In order to help inform our comments on the Proposed 111(d) Rule, and to determine the viability of a regional plan when compared to a state plan, the PSCW expended substantial resources modeling likely compliance scenarios.  The purpose of this model was to forecast the cost of the changes in the Wisconsin utility market that would be necessary to comply with the Proposed 111(d) Rule. With input from stakeholders, engineers from the PSCW collaborated with MISO to build a model using the "Electric Generation Expansion Analysis System

- 3 -

P000060

("EGEAS"). Several model runs were completed, analyzed, and presented with our comments to the EPA. We also presented the modeling results in several different conferences with Wisconsin stakeholders.

6. The PSCW has begun its comprehensive review of the Final Rule and its effects on everyone who pays an electric bill in Wisconsin.

The Final Rule is significantly different, which means, absent a stay, PSCW staff must undertake another intensive investigation into the requirements of the Final Rule and start over with evaluation of compliance paths and modeling. Similarly, if litigation changes the Final Rule, much of the time and energy invested in understanding and compliance planning for the Final Rule will have been wasted. Wisconsin will be forced to choose between following through with compliance of the un-altered Final Rule, or starting over with a third investigation and compliance analysis.

7. Based on my knowledge and experience in analyzing the Proposed and Final 111(d) Rules, the Final Rule represents an intrusion by the EPA on the traditional authority of Wisconsin to manage energy resources within our jurisdiction. The Final Rule also raises uncertainty about the role of the Federal Energy Regulatory Commission to ensure the reliability of electricity through the wholesale market. Without clarity on the roles of different state and federal agencies, the PSCW is at risk of violating any number of rules, order, and

- 4 -

P000061

mandates. The Final Rule should be stayed until these jurisdictional questions are fully adjudicated.

8. Absent a stay from this Court, compliance planning must begin immediately. The system-wide changes necessary for compliance will require collaboration among other state agencies, stakeholders and other states, and resulting compliance measures must be implemented gradually to preserve reliability of the electric grid. Because there are interim limits that must be achieved, the longer Wisconsin waits to begin planning, the more expensive and difficult it will be to meet the requirements of the Final Rule.

9. Absent a stay from this court, evaluation of specific compliance measures, such as the construction of new facilities or retirements of existing facilities, must also begin immediately. In order to have facilities constructed, upgraded, or decommissioned before the compliance period begins in 2022, the lengthy application, in-depth evaluation, and approval process for utilities to construct, upgrade, or retire facilities to comply with the Final Rule requires utilities to plan and submit applications almost immediately after publication of the Final Rule, and even before an EPA-approved State or Multi-State plan.

10. For example, the Final Rule will likely require one or more new natural gas plants in Wisconsin. A new natural gas combined cycle plant takes at least five years from application to operations. Before submitting an application for a new

- 5 -

P000062

generation resource that requires a certificate of public convenience and necessity (CPCN) from the PSCW pursuant to Wis. Stat. § 196.491(3), a utility conducts a needs assessment, site selection, and pre-engineering work. This work can take more than a year to complete. In addition, the utility works with the transmission owner and the Regional Transmission Operator, MISO, to get in the generator queue. Then, the utility submits an application for a CPCN, including full environmental review and analysis of need by the PSCW, which requires a contested case hearing. This process can take up to one year to complete. After the CPCN is issued, it takes another three years for final engineering and construction before the plant can go into service. Waiting until litigation is complete to begin implementing the measures required in the plan would make it impossible for Wisconsin to meet the 2022 goal, and even more costly and difficult to meet the final 2030 goal.

11. Ideally, a utility would wait until the state plan was approved by the EPA before planning for future resources, but even if a utility starts planning today, it is possible that the new plant would not be commissioned before the 2022 initial interim deadline. The interim goals will also force utilities to act more quickly than the usual 30 to 40 year planning timeframe, which could preclude building new generation that requires an even longer planning schedule, such as nuclear plants. Even with an extension of time for the interim goal to 2022, if the

- 6 -

P000063

2030 goal remains in place during litigation, Wisconsin utilities will have no choice but to begin implementing compliance measures immediately, subject to the PSCW approval.

12. Not only does commissioning plants include a lengthy approval process, but so does decommissioning plants. Utilities cannot simply shutter a plant's production. Utilities must apply to the MISO for permission to decommission a plant. MISO then evaluates the entire multi-state system for reliability concerns, and can, in fact, decline to allow a plant permission to decommission. MISO has to ensure that enough base load resources are available to fill the void of a decommissioned plant, which may mean importing or constructing new sources. This process lasts at least 26 weeks from application to decommissioning. If Wisconsin's plan is not approved until September of 2019, there may not be enough time before the 2022 interim goal to follow the established retirement procedure. Absent a stay, plants may be prematurely retired, which is difficult, expensive, and in some cases impossible, to reverse..

13. State goals in the Final Rule were calculated based on a significantly higher reliance on natural gas and renewable generation. Compliance with the final rule is likely to severely increase the cost of electricity by forcing Wisconsin to move immediately toward reliance on a limited number of fuel sources. The risks associated with this type of system-wide transformation is likely to begin

- 7 -

P000064

occurring in the next year, unless the Final Rule is stayed. Wisconsin's electric generation system relies on multiple fuel sources: coal, natural gas, nuclear, biomass, biogas, wind, solar, fuel oil, and international and domestic hydropower. This balanced portfolio approach reduces the risk that electric rates or reliability will be harmed by the price volatility or unavailability of any single fuel source. For example, if the price of natural gas increases significantly, then Wisconsin's system can rely more heavily on other sources, keeping the retail prices stable. The modeling performed by the PSCW on the Proposed 111(d) Rule indicates that in order to comply with Final Rule, utilities will become much more heavily reliant on natural gas as base load generation. This means the overall generation portfolio will be heavily dependent upon one fuel source, creating a high risk for increased system fuel cost as the market for that particular fuel source changes. In other words, if natural gas becomes scarce due to price fluctuations or an interruption in the supply, then generators, and subsequently ratepayers, will experience significant price spikes. The possibility of a significant long-term increase in the price of natural gas due to increased regulation of production methods like fracking could further inflate prices. Given the timelines imposed by the Final Rule, it would be unreasonable for the PSCW to wait until litigation is complete to begin working with utilities on specific compliance measures that move the generation

- 8 -

toward heavy reliance on natural gas, which will directly and irreversibly impact the cost of electricity in Wisconsin.

14. The immediate and sweeping changes to the generation fleet could also result in significant decreases in reliability. As noted, PSCW modeling on the Proposed 111(d) Rule showed heavy reliance on natural gas plants in Wisconsin. The output of most renewable sources cannot be easily controlled or dispatched, and is dependent upon the weather conditions. Currently, gas plants that can ramp production up and down very quickly and are used to respond to load variances caused by more intermittent renewable energy resources. For example, if the wind dies or the sun is blocked by clouds, the natural gas plants are used to quickly ramp up energy production to make up for the production loss from the renewable sources, maintaining a balance of supply and demand on the electric grid. Other generation types, such as nuclear and coal facilities, are not able to ramp energy production up and down fast enough to respond to the rapid changes resulting from renewable resources. However, the Final Rule encourages natural gas plants to operate at capacities of 75% or higher, leaving very little capacity that is free to respond to rapid demand changes on the grid. The amount and intensity of these rapid changes will only be exasperated by the increase of renewable resources brought onto the system for 111(d) compliance. The inability to use the natural gas fleet to respond to these rapid supply-demand changes could result in system

- 9 -

P000066

overloads, equipment failures, forced shutdown of customer energy supply, and significant reliability concerns. If the Final Rule is not stayed, there will be limited time to study and prevent reliability failures. The immediate large scale changes to the electric system required by the Final Rule before 2022 could reduce reliability.

15. Changes made for the sake of compliance with the Final Rule immediately and over the next calendar year will be irreversible and will impact the electric grid for decades. If system planning begins and capital is committed, and then the Final Rule is invalidated by a court, investors, taxpayers, and ratepayers will all suffer the financial consequences.

16. In addition, implementation of the Final Rule may require legislative changes which could alter the daily operation of utilities. Specifically, the Final Rule allows compliance measures outside of the physical location and control of electric generating units, such as end-use energy efficiency (reduced energy use by electricity consumers), demand response(usage changes according to instantaneous market and load-profile changes), increased distributed generation (such as small residential renewable installations), and increased reliance on renewable generation. For example, a utility can encourage, through financial incentives or otherwise, the use of energy efficiency or demand response, but the utility has no ability to force customers to reduce usage. Parameters for utilities to encourage their customers to rely on these control measures are currently set in state statute.

- 10 -

Wis. Stat. § 196.374(3)(b)2 only allows the PSCW to require utilities to spend 1.2 percent of their annual operating revenues on energy efficiency programs. The PSCW does not have authority to force a larger investment in energy efficiency without a statutory change, and will be unable to rely on energy efficiency as a compliance option without these statutory changes.

17. Moreover, higher rates may encourage more customers to install distributed generation on their own property over which the utility has no control. The utility must still provide backup generation to these customers, which will result in a higher cost system. Wisconsin may have to immediately set in motion the chain of events, including statutory changes, larger investment in customer-side behavior, and further rate restructuring, in order for these compliance options to contribute the amount of carbon reduction EPA expects from them by 2030. This chain of events would be difficult to reverse, and should not begin before there is certainty about the legality of the Final Rule.

18. If Wisconsin joins in a multi-state compliance approach, it's likely to take the form of credit trading or an induced carbon price through the RTO, which will require participation of third party actors, such as the MISO or M-RETS. The members of those organizations must follow a prescribed stakeholder process to effect the changes, and Wisconsin must agree to grant certain enforcement powers to those organizations. The stakeholder process and any necessary institutional

- 11 -

P000068

changes for entities like MISO and M-RETS will likely need to be completed before a plan relying on those third parties can be submitted for approval to the EPA. These processes are lengthy and may require immediate attention if the Final Rule is not stayed during litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on **8/7/15**                      _Ellen Nowak_
                                             Ellen Nowak


- 12 -

P000069

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

      Petitioners.

Case No. 15-_____

---

## DECLARATION OF PATRICK STEVENS,
## WISCONSIN DEPARTMENT OF NATURAL RESOURCES

---

I, Patrick Stevens, declare as follows:

1. I am the Division Administrator of the Environmental Management Division at the Wisconsin Department of Natural Resources ("WDNR").

2. I have personal knowledge and experience to understand what steps the State of Wisconsin has taken and will need to undertake in response to the EPA's proposed *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Generating Units,* 79 Fed. Reg. 34, 830 (June 18, 2014) ("111(d) Rule").

3. Based on my experience in this position, I have determined that implementing the 111(d) Rule will be a complicated and time-consuming endeavor. In terms of scope and level of effort, the 111(d) Rule is unlike any other Clean Air Act implementation activity

undertaken by the WDNR in recent history. Already, WDNR employees have expended over 2500 hours understanding the proposed rule and evaluating potential implementation options, including outreach to numerous stakeholders[1] in Wisconsin, organizing individual and joint stakeholder meetings and listening sessions, participating in regional collaborative efforts with other states and industry participants such as Midcontinent States Environmental and Energy Regulators and the Midwest Power Sector Collaborative, attending EPA listening sessions and conference calls, and in-depth analysis of the impact of the 111(d) Rule on the state and regional systems.

4. WDNR also expended significant resources to understand how the proposed 111(d) Rule would impact energy providing utilities, including investor-owned utilities, municipal utilities, and co-operative utilities. WDNR, together with the Public Service Commission of Wisconsin ("PSCW") has studied each utility's unique fleet of electric generating units, interactions among the different utilities, interactions between in-state and out-of-state facilities of an individual utility, and the interaction of Canadian hydro-electric power with the state and regional system.

5. Much of the time and energy invested in understanding and evaluating the proposed rule is irrelevant to the final 111(d) Rule. The final 111(d) Rule is significantly different, which means WDNR staff will need to undertake another intensive investigation into the requirements of the Rule and start over with evaluation of compliance paths. Similarly, if the Rule is not stayed and the Rule is altered or vacated, much of the time and energy invested in understanding and compliance planning for the final 111(d) Rule may have been wasted.

---

[1] Stakeholders include regulated utilities, merchant-owned EGUs, municipal utilities, utility cooperatives, environmental groups, industry groups, residential and small business representatives, MISO, M-RETS, and representatives from other entities interested in or impacted by the 111(d) Rule.

P000071

6.   State government resources necessary for implementation of the 111(d) Rule are expected to be even greater than what has already been expended.  The 111(d) Rule gives the state until September 6, 2016, to submit an initial state plan, with a two-year extension available.  In the event Wisconsin decides to prepare a state plan, preparing and submitting a timely plan will require several dedicated WDNR staff members, as well as significant resources from other state agencies, stakeholders, and the legislature.  Though the time to submit a plan was extended in the final rule, the emissions reduction goals must still be met by 2030.  Therefore, absent a stay, compliance planning and implementation must both begin immediately in order to meet the final goal.  Any delay in submitting a final plan for approval will only reduce the amount of time Wisconsin has to implement that plan.  If the rule is not stayed during litigation, and is ultimately vacated or amended, significant time and resources will be wasted on compliance planning and implementing the current 111(d) Rule.

7.  Both the proposed and the final 111(d) Rule include measures that are not within the direct control of either utilities or the WDNR, and will require large scale changes to environmental regulation in Wisconsin.  The final rule sets a rate for existing plants that is not achievable absent measures taken outside of the plant's boundaries.  WDNR's current authority is limited to regulation of stationary sources, as well as some mobile sources, of emissions.  In order to have the ability for WDNR to directly regulate and enforce in-state compliance options of the plan that are outside of the fenceline of the stationary sources, such as energy efficiency and increased reliance on renewable energy, the Wisconsin Legislature will have to re-write state statute to fundamentally change the WDNR's authority.  Furthermore, it is unknown how the Legislature would react to any such proposal.  These complications highlight the difficulty of creating an enforceable compliance path either as an individual state or as a region since many of the carbon-

- 3 -

P000072

reduction measures are not within the direct control of the regulated utilities. Legislative changes would be most appropriate after the rule is fully adjudicated.

8.  More specifically, the process to create a state plan for the 111(d) Rule includes several required steps and will take three or more years to complete. The 111(d) Rule describes at least six potential compliance plan options available to the states. EPA identifies seven specific elements that every state plan must include, not including additional demonstrations that a state has considered electric system reliability in developing its plans and that the state engaged all stakeholders potentially impacted by the plan. In addition, EPA specifies certain additional components that certain plans must include, including a demonstration that the plan's reductions are quantifiable, non-duplicative, permanent, verifiable, and enforceable. Some compliance options could require additional legislative changes. The 111(d) Rule should be stayed during litigation because a policy change this significant should not be pursued until the legality of the 111(d) Rule is definitively determined.

9.  Demonstrating that Wisconsin's 111(d) state plan meets all necessary components will require Wisconsin to develop and finalize new state rules and potentially acquire statutory changes by September 6, 2018, assuming Wisconsin receives a two-year extension. WDNR estimates that a simple, noncontroversial state rule takes at least 27½ months to complete all steps required under Wis. Stat. ch. 227, Subchapter II. In my experience, the complex and contentious 111(d) Rule will take significantly longer than the timeframe for a simple, non-controversial rule because of the stakeholder input required for such a comprehensive regulation of the entire electric generating system. In addition, the federal requirements for adoption and submittal of state plans at 40 C.F.R. 60.23 also include requirements for public hearing and opportunity for comment. In my opinion, it will be difficult and will require dedicated resources for Wisconsin to complete a state plan

- 4 -

within the timeframes allowed in the 111(d) Rule. Absent a stay of the Rule, these state law changes may ultimately need to be reversed or otherwise changed again once litigation is complete.

10.   In the absence of a stay, it is not practical for WDNR to wait for the completion of litigation to begin working with utilities on compliance. It is already doubtful that the state plan will be approved and implemented in time for utilities to comply  before the first interim goal compliance period in 2022. Waiting until litigation is complete to begin that work would make it impossible for Wisconsin to meet interim goals, and even more costly and difficult to meet the final 2030 goal. In the event the state chooses to participate in certain compliance options involving a multi-state plan, the state may need to enter into either a memorandum of understanding or agreement with the other states. For example, under certain multi-state planning scenarios, EPA requires states to agree upon a joint emissions reduction goal equivalent to the individual goals of each participating state and to document the analytic process, tools, methods, and assumptions used to calculate the joint multi-state goal. The state has limited experience in pursuing this type of agreement with other states, and anticipates that a significant amount of time would be required to negotiate and reach consensus on the content of such an agreement with other state agencies. This time-consuming process would be a waste of resources if the 111(d) Rule is ultimately changed or vacated. Even a minor adjustment in goals for participating states, compliance options available, or compliance time could dramatically change the compliance plan. Given the lengthy planning process for writing, submitting, and approval of a plan, and associated state law changes, it is likely it would not be practical to re-submit a new compliance plan within the 111(d) timeframes if litigation alters the final 111(d) Rule but does not stay compliance during litigation. Utilities affected by the state's originally

- 5 -

submitted compliance plan will likely have already made adjustments to their operation, rendering a successful legal challenge useless.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___8 / 7 / 15___                              _____

                                                           Patrick Stevens

- 6 -

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE STATE OF WEST VIRGINIA, et al.,

        Petitioners,

Case No. 15-_____

---

**Declaration of Brandy Wreath**
**Public Utility Division**
**Oklahoma Corporation Commission**

---

Pursuant to 28 U.S.C. § 1746, I, Brandy Wreath, declare and state that the following is true and correct and is based on my own personal knowledge.

1.        I am the Director of the Public Utility Division (the 'Division") of the Oklahoma Corporation Commission ("OCC"), a position I have held since 2012. In this position, I am responsible for administering and enforcing the State's regulation of public utilities, including electric utilities, and for advising the OCC on matters relating to the regulation of electric utilities and electric service. A primary responsibility of the Division is assuring reliable utility service at the lowest reasonable cost. Division staff investigates and makes recommendations on matters such as establishment of rates or rate adjustments, changes in terms of services, and transfers of utility ownership.

P000076

2.    The OCC is currently expending substantial resources-in terms of money, personnel, effort, and administrative focus-to comply with EPA's proposed regulations for existing power plants under Section 111(d) of the Clean Air Act (the "EPA Power Plan").

3.    OCC staff participates in meetings regularly to coordinate regulatory responses to the EPA Power Plan with other components of the Oklahoma government, including the Oklahoma Secretary of Energy and Environment, and the Oklahoma Department of Environmental Quality. This coordination is necessary because the EPA Power Plan touches practically every aspect of electricity production, distribution, and consumption and therefore reaches across agency jurisdictional boundaries. As far as I am aware, this required degree of coordination to accommodate a federal rule affecting the utility sector is unique, and it is, with respect to the activities required of OCC, unprecedented.

4.    OCC staff participates in stakeholder meetings regularly with persons and entities affected by the EPA Power Plan, including utilities and groups representing energy consumers.

5.    OCC staff is working continuously with the Southwest Power Pool ("SPP"), which is the regional transmission organization for Oklahoma and surrounding states, to evaluate the actions necessary to accommodate the EPA Power Plan, to plan infrastructure projects that will be necessary to accommodate the EPA Power Plan, and to coordinate other activities respecting the EPA Power Plan. Currently, three full time equivalent Division employees spend all or nearly all of their time working with the SPP on these activities in addition to the other transmission related issues.

6.    Oklahoma utilities are engaged currently in planning to accommodate the EPA Power Plan, and the Division is working closely with them to ensure that their contemplated actions satisfy Oklahoma law, are properly coordinated with other actions affecting power supply and delivery, satisfy all relevant reliability requirements, and provide good value to ratepayers. Oklahoma utilities, as well as other power suppliers to Oklahoma consumers, are contemplating and making decisions currently regarding infrastructure changes necessary to respond to the EPA Power Plan that will be difficult or impossible to reverse once these

P000077

decisions have been made.

7.    Compliance with EPA environmental plans has already been a topic of at least one recovery hearing before the OCC.  Recovery hearings determine which expenditures utilities may charge to ratepayers.    Recovery hearings generally involve numerous intervenors-including environmental organizations-and weeks-long hearings before an Administrative Law Judge.  Months of work, in terms of person-hours, is required to prepare for this type of hearing.  OCC's fees for outside experts alone amount to hundreds of thousands of dollars for these types of hearings.

8.    Any OCC rule or order that reflect measures to accommodate the EPA Power Plan will impose costs on the Division for years to come, due to its monitoring and enforcement roles.

9.    Numerous OCC personnel and outside contractors are currently involved in activities regarding the EPA Power Plan.  This includes multiple in-house experts with expertise in accounting, economics, financial analysis, and law. I personally spend numerous hours per week working on matters relating to the EPA Power Plan.  The time that OCC personnel spend on matters relating to the EPA Power Plan is time that they are unable to devote to other agency priorities; as a result, OCC has been unable to devote the manpower that it would like to other priorities.

10.    At the same time, being aware that the manpower necessary to accommodate the EPA Power Plan will balloon in coming months, OCC has assigned personnel to complete tasks that would be due in those months ahead of schedule. This too limits the OCC's ability to address other responsibilities.

11.    Division staff has attended and will continue to attend numerous conferences regarding the EPA Power Plan so that the OCC is best able to meet the challenges of the EPA Power Plan.  This comes at a cost to the OCC, in tens of employee time and travel expenses.

12.    OCC has no choice but to begin activities now to accommodate the EPA

P000078

Power Plan. This is due to the EPA Power Plan's aggressive and unrealistic deadlines, the extent of the activities that will be required to accommodate the EPA Power Plan, the long lead time required to make and execute decisions regarding electric infrastructure, and the magnitude of the changes.

13.    For example, determining the need for additional or new transmission capacity is a years-long process involving numerous stakeholders, and once that need is identified, another six to eight years is typically required for major projects to reach completion and be integrated into the grid.

14.    If the OCC were not taking such actions at this time to prepare for the EPA Power Plan, it would not be able to accommodate anything like the EPA Power Plan anywhere close to the schedule.

15.    The same is true of the utilities regulated by the OCC. Currently they are engaged in planning and other activities, as well as making investment decisions, to attempt to comply with or accommodate the EPA Power Plan.

16.    Uncertainty relating to the EPA Power Plan has complicated the planning and execution of infrastructure projects. For example, the EPA Power Plan places investments in transmission capacity at risk because plant retirements due to the EPA Power Plan may render that capacity unnecessary. Similarly, the EPA Power Plan has made power plant owners reluctant to perform upgrades at this time, due to the risk that those plants may have to be retired to accommodate the EPA Power Plan.

17.    The Division is concerned deeply about the EPA Power Plan's impact on the health and welfare of Oklahoma residents. The EPA Power Plan's heavy emphasis on natural gas comes at the expense of fuel diversity, and lack of diversity increases the risk and impact of supply disruptions and price volatility. As part of its public mission, the OCC is attempting to address this issue, which EPA has ignored.

18.    On August 3, 2015, the EPA announced the Final Rule under which it intends to implement its Clean Power Plan. I have reviewed that Final Rule and have concluded that it confirms the necessity for the actions I have described above, by making firm all compliance

P000079

requirements, including emissions-reduction targets, state options and deadlines for state action and, as a result, increases the amount of State resources that have to be expended, as State agencies pursue the time-consuming work of evaluating and responding to the final terms of the EPA Clean Power Plan.

I declare under penalty of perjury under the laws of the United States of America that the above and foregoing is true and correct to the best of my knowledge.

Executed on this 11th day of August, 2015.

Brandy Wreath

P000080